**M.L.G., Appellant,**

v.

**J.E.G., Respondent.**

**No. WD 35132.**

Missouri Court of Appeals,
Western District.

April 10, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 29, 1984.

Application to Transfer Denied July 17, 1984.

Jack A. Cochran, Blue Springs, Cochran, Tyree, Oswald, Barton & McDonald, P.C., for appellant.

Lynn K. Ballew, Harrisonville, for respondent.

Before TURNAGE, C.J., KENNEDY, J., and SWOFFORD, Senior Judge.

TURNAGE, Chief Judge.

This suit involves a motion brought by the father, Michael, to change the primary custody of the 10 year old daughter, Holly, from the mother, Jayne, to himself. The court denied the motion and Michael appeals contending that the judgment is against the weight of the evidence. Reversed and remanded.

There is no dispute as to the facts; thus, the circuit court was not called upon to pass on the credibility of witnesses. The grounds upon which Michael relies to justify a change of custody, pursuant to § 452.-410, RSMo 1978, were all admitted by Jayne.

On being called as an adverse witness, Jayne testified that her marriage with Michael was dissolved in 1976, when Holly was about 3 years old. The court granted Jayne primary custody of Holly, and vested periods of temporary custody in Michael. In 1980, Jayne enlisted in the Navy and immediately attended Officer's Candidate School. While Jayne was in school in Rhode Island, Holly stayed with Jayne's mother. After Jayne received her naval commission she was assigned to Corpus Christi, Texas, and shortly after she moved to that assignment Holly began living with her.

Jayne and Holly lived on base in an apartment in a four-plex building. Holly attended school and then went to a child care center after school until Jayne returned home from duty. When Holly was in second grade Jayne allowed her to return home after school and remain there alone for periods of over an hour until Jayne arrived home.

Jayne testified that on an average of once or twice a week she would go out to the Officer's Club about seven in the evening and remain until some time between 10:00 p.m. and 2:00 a.m. During these times Jayne left Holly alone at the apartment. On one occasion when Holly was left alone, the pan she was cooking in overheated and started to smoke. Holly sought assistance from the neighbor downstairs who took care of the situation. This incident apparently frightened Holly and she called her father in Missouri and told him about being left alone.

Jayne further testified that she had men spend the night with her in the apartment while Holly was present. She stated that over a period of 2 years she had 5 different

men spend the night with her. She said Holly was aware that the men were there and that Holly generally would see these men in the morning before going to school.

Jayne further testified that she rarely got up in the morning to see Holly off to school or to fix her breakfast. She generally did not get up until between 9:00 and 10:00 a.m. on Sunday, did not attend church, and did not make arrangements for Holly to attend.

Jayne also testified that on one occasion she took Holly to the apartment of one of her male friends and spent the night with the man while Holly slept elsewhere in the apartment. Jayne testified that she saw nothing wrong with having men spend the night with her or in going to the apartment of her boy friend and spending the night with Holly present in the apartment. Nor, did she see anything wrong with leaving Holly alone when she arrived home from school or with leaving her alone when she went out socially in the evening. She stated that it was her intent to continue all of those patterns of conduct.

After Jayne had testified during the morning session, the trial court had a conference with the attorneys and told Jayne's attorney that unless she agreed to stop (1) leaving Holly alone after school and at night, (2) having men spend the night in her apartment, and (3) going to her boy friend's apartment with Holly to spend the night, the court was going to transfer custody to Michael. During the afternoon session Jayne resumed the witness stand and agreed that she would conform to the court's request concerning her conduct.

Michael testified that he had been remarried 6 years, his wife had a 13 year old daughter living at home, and that he and his wife were the parents of a 4 year old son. He stated their home was of sufficient size that each of the children, including Holly, could have a separate bedroom. His wife worked only during school hours at a pre-school where their son attended so she was home when the children arrived there. Michael has a stable job and stated that during the periods when Holly had been with him in the summer she had gotten along well with the other children in the home and with his wife. He also stated that he and his family attended church and when Holly was living with them she accompanied them.

Michael's wife testified that Holly had been in their home on temporary visits, that she and Holly got along well, and that she would be happy to have Holly live with them on a permanent basis. She stated that she would be at home when Holly arrived home from school, that they would never leave Holly alone, and that if the couple went out they would always have a mature baby-sitter.

Michael had Holly interviewed by a psychiatrist in Kansas City. The psychiatrist testified that she would have serious concerns about Holly being left alone, especially in the evening, from both a physical and emotional standpoint. She stated that a child is not ready to cope with being left alone at night at the age of 10. She further testified that it was not in Holly's best interest to be in the home with men coming in because that would engender a great deal of confusion on Holly's part. She said that being left alone had caused Holly to have feelings of being unprotected.

After learning that Holly had called her father and told him she was being left alone, Jayne took Holly to see a psychologist in Corpus Christi. The psychologist said that Holly did not have any severe emotional problems but that she was upset over being in the middle between her parents and sometimes felt overwhelmed by the tensions caused by that situation. He gave as his opinion that, as a result, she had suffered some adjustment reaction with anxiety. He agreed that it was not good for her to be left alone. Holly has done well in school and her parents agree she is a very intelligent child.

The court and both attorneys on the record interviewed Holly in chambers. Holly spoke about being left alone after school and on the occasions when her mother went out. She also spoke about the various men who spent the night with her

mother and said that she had seen her mother in bed with a man. She also stated that she and her mother had gone to the apartment of her boy friend. Holly stated that she would feel comfortable living with either her mother or her father.

At the conclusion of the case the court made a lengthy statement explaining its reason for denying the motion to change primary custody. The court stated that if it had found that Holly was suffering from extreme emotional disturbance and not getting along well it would have changed custody. The court told Jayne that she was going to have to change; that she could not leave Holly alone, have men spend the night in her apartment, or go to other places to stay with Holly present.

The judgment entered by the court provided that Jayne would provide for direct supervision of Holly during all the time that Jayne was absent from the residence. It also provided that Jayne refrain from having overnight adult male guests in her home while Holly was present and from making overnight trips to the residences of adult men, family members excepted, with the child present.

▆▆▆ While no court can force a parent to observe any particular moral code, the moral fitness of a person seeking custody of a child is a proper subject for the court's consideration. *In re the Marriage of V.M. v. L.M.*, 526 S.W.2d 947, 950 (Mo.App.1975). Courts have consistently condemned exposure of children to adulterous and immoral conduct. In *In re Marriage of J.H.M. and E.C.M.*, 544 S.W.2d 582, 585[2] (Mo.App. 1976), the court observed that critical to its decision to award custody to the father was the fact "that the mother's affairs were conducted with the children's knowledge and while they were present in the house." *Id.* at 585[2].

In *L.H.Y. v. J.M.Y.*, 535 S.W.2d 304 (Mo. App.1976), the court considered a custody question involving sexually promiscuous behavior by the mother. The court stated at 308:

> We do recognize that today we have changing standards of morality. Certain

conduct once looked upon by society with opprobrium does not carry the social or private stigma it once did a few short years ago. Such conduct may even be socially "approved." But private personal conduct by a parent which could well have an effect on children during the years in which their character, morality, virtues and values are being formed cannot be ignored or sanctioned by courts. Private conduct of a parent in the presence of a child or even under some other circumstances may well influence his or her young, impressionable life.

The court added that "it is not necessary to wait for manifestations of harmful consequences before action is taken."

▆▆▆ The requirement of a demonstrated harmful effect on a child before a change of custody is ordered has been the subject of some inconsistency in the Eastern District. However, this court has taken the position that a court does not need to wait until there is demonstrated damage done to a child. In *N.K.M. v. L.E.M.*, 606 S.W.2d 179, 186[11] (Mo.App.1980), this court said:

> If the child's situation is such that damage is likely to occur as her sexual awareness develops with the approach of young womanhood, the court may in a proper case remove her from the unwholesome environment.

Also, in *Mansell v. Mansell*, 583 S.W.2d 284, 287 (Mo.App.1979), this court quoted extensively from *L.H.Y. v. J.M.Y.*, supra, to the effect that it is not necessary to wait for manifestation of harmful consequences before action is taken.

The inconsistency in the Eastern District cases was recognized in *Ryan v. Ryan*, 652 S.W.2d 313 (Mo.App.1983). In *Ryan* the court held the correct rule to be that the court is not required to wait until a child has suffered demonstrated damage or harm before a change of custody is made. The court stated at 316[4]:

> It is more sensible to change a child's custody when there is a reasonable likelihood of an adverse affect on the child than to wait until the damage is done and

attempt to repair that damage. Thus, we find the more recent standard the proper standard to use.

The *Ryan* court recognized that this court already had adopted in *Mansell* and *N.K.M.* the rule which it was adopting.

It is apparent that the trial court in this case strongly disapproved of Jayne's practice of leaving Holly alone and of having men spend the night in her apartment while Holly was present. However, in grounding its decision on the fact that Holly had not yet suffered any extreme emotional disturbance the court failed to follow the rule stated in *Mansell*, *N.K.M.*, and *Ryan*.

From the evidence in this case it is obvious that Holly was extremely frightened and disturbed by being left alone, especially at night. The expert witnesses agreed that Holly was too young to be left alone at night, yet Jayne, in her deposition and initial testimony, said that she found nothing wrong with the practice and conduct and intended to continue it. The same is true as to the practice of having men spend the night in her apartment while Holly is present. Again, Jayne found nothing wrong with this life style and in her deposition and initial testimony said she intended to continue the practice.

The fact that no evidence suggested that Holly had suffered severe emotional disturbance by the time of the hearing cannot justify the refusal to change her primary custody. The evidence clearly reveals Jayne's neglect of Holly and the girl's continuous exposure to Jayne's immoral life style. To leave a girl of 10 in that environment is likely to lead to severe emotional disturbance as well as adversely affect the development of her own character and morality. Under the circumstances, the court should not await actual damage before taking action to remove Holly from the unwholesome influence of her custodial parent.

There is no dispute in the evidence that Michael's home offers Holly a wholesome atmosphere and a stable family relationship. Holly said that she would feel comfortable living in that home and no one has disputed that fact.

This court finds that Holly is more than likely to suffer from living in the unwholesome environment in which she has been cast. Because the court misapplied the law by holding that demonstrated damage to Holly was required to change custody, the judgment is reversed. This cause is remanded with directions to enter judgment changing primary custody from Jayne to Michael. Provisions for visitation by Jayne are to be set by the trial court on remand.

All concur.