Debra L. WILHELMSEN, Respondent,

v.

Frederick C. PECK, Appellant.

No. 15065.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 31, 1987.

Wayne Gifford, Waynesville, for appellant.

William W. Hoertel, Hoertel & Hoertel, Rolla, for respondent.

CROW, Chief Judge.

On December 20, 1983, the Circuit Court of Fairfax County, Virginia, entered a "decree of divorce a vinculo matrimonii," awarding Frederick Chapman Peck ("Fred") a divorce from Debra Lynn Peck ("Lynn"). The decree affirmed and incorporated a separation agreement between Fred and Lynn dated August 5, 1983. Pertinent. to the issues in the instant appeal, the agreement provided that Lynn should have "sole care, custody and control" of the parties' two sons, Ryan Andrew Peck, born August 17, 1978, and Joshua Robert Peck, born July 17, 1980, "subject to the right of reasonable visitation vested in [Fred]."

On March 19, 1986, Lynn—who had acquired the surname Wilhelmsen by virtue of her marriage to Edwin Lee Wilhelmsen ("Ed") on January 26, 1986—filed in the Circuit Court of Pulaski County, Missouri, a motion to modify the Virginia decree. Lynn's motion averred that Missouri had been the home state of the two children since August 16, 1984, that during the summer of 1985 Fred had exercised his visitation privileges by transporting the children to his home in the state of California, that he had thereafter refused to return the children to Lynn in Missouri, and that he had told her he had authority to keep the children in California because of the word "reasonable" in the Virginia decree. Lynn's motion prayed for an order allowing Fred "specific visitation privileges" and requiring him to pay the children's transportation costs to and from his home when they visit him.

Fred responded to Lynn's motion by filing his own motion to modify averring,

among other things, that since their divorce Lynn had "openly and notoriously cohabited with one or more men to whom she was not married," and that she had "forced" the two children to live with her during such cohabitation. Fred's motion prayed that the divorce decree be modified by (a) awarding custody of the children to him, subject to reasonable and specific visitation rights in Lynn, and (b) granting him authority to remove the children from Missouri "without further order of this Court or consent of [Lynn]."

On January 21, 1987, the Circuit Court of Pulaski County entered an amended decree providing that primary custody of the children would remain with Lynn. The decree further provided:

"The Court ... orders that [Fred] be allowed visitation with said two minor children for one month each summer, the month to be the month of July in odd numbered years and August of even numbered years.

Further, [Fred] is granted visitation privileges with said two minor children during the Christmas vacation on even numbered years, the visitation to begin the day after the school Christmas vacation begins and is to terminate December 31st of the same year.

[Fred] is further allowed to visit said children and have said children with him during the Thanksgiving holiday in odd numbered years, the visitation to commence at 5:00 o'clock P.M. on the next preceding Wednesday before Thanksgiving, and is to continue until 3:00 o'clock P.M. the next following Sunday, and all such Thanksgiving visitation shall occur within the state of Missouri.

Further, [Fred] is allowed reasonable visitation with said two minor children at all other times.

. . . .

[Lynn] allowed reasonable visitation when children are with [Fred].

[Fred] is hereby ordered to pay all transportation costs for both Ryan Andrew Peck and Joshua Robert Peck from their place of residence to the place of visitation with [Fred] and back again, on those dates and times stated heretofore in this decree."

Fred appeals, briefing four assignments of error. His first maintains that the trial court erred in denying his request that primary custody of the children be placed in him, in that Lynn admitted she had lived in a meretricious relationship with two different men and the children had lived in the same households, and Lynn admitted she had refused to allow Fred visitation with the children during the pendency of the modification proceeding.

Before considering Fred's first point, we note that no issue is raised regarding the jurisdiction of the trial court to make the custody determination, § 452.445(1), RSMo 1986, set forth in its amended decree. Accordingly, we shall assume, without deciding, that the trial court was vested with jurisdiction to do so under the Uniform Child Custody Jurisdiction Act, §§ 452.440.-550, RSMo 1986.

Fred, born September 25, 1948, is a graduate of the United States Naval Academy. He entered the United States Marine Corps June 3, 1970, and at time of trial[1] was a lieutenant colonel assigned to the Marine Corps public affairs office in Los Angeles, California. He and Lynn married December 21, 1974. It was his second marriage, her first. His first marriage, which had ended in divorce, produced a son, Scott, age 18 at time of trial. Custody of Scott had been awarded to Fred's first wife in their divorce decree.

On January 19, 1984, thirty days after his divorce from Lynn, Fred married his present wife, Joanne Lynn Schilling ("Joanne"), a captain in the United States Marine Corps. It was Joanne's third marriage. Her first two produced no offspring.

Lynn, born February 8, 1955, moved into her parents' home in New Johnsonville, Tennessee, after her separation from Fred, taking her two sons with her.

1. Trial occurred January 12, 1987.

In May, 1984, Lynn, accompanied by the two boys, drove from her parents' home to Virginia, where Joanne, who had wed Fred four months earlier, was finishing some military schooling at Quantico. Lynn's purpose was to enable Fred to pick up the boys there for summer visitation. Fred did so.

In August, 1984, while the boys were still with Fred and Joanne, Lynn moved from her parents' home to Waynesville, Missouri, where she took up residence with one James Stewart, with whom she had become acquainted at some undisclosed earlier time.

After Labor Day, 1984, Fred and the boys flew to St. Louis, where they were met by Lynn. She took the boys with her to the two-bedroom house she was occupying in Waynesville with Stewart, whom the boys had never met. During the quartet's residence there the boys slept in one bedroom; Lynn and Stewart slept in the other.

This arrangement ended in January, 1985, when Lynn and the boys moved into a "cabin" in Devils Elbow, Missouri. About June 4, 1985, Fred and Joanne arrived there and, with Lynn's consent, picked up the boys, taking them to California.

Around the first of August, 1985, while the boys were still with Fred and Joanne, Lynn moved into a "trailer" in Waynesville, owned and occupied by Ed, whom she had met at some unspecified earlier time. Ed, an "over-the-road" truck driver, was married when he and Lynn began cohabiting, but became "divorced" September 9, 1985.

Prior to the start of school in September, 1985, Lynn phoned Fred about returning the boys. At trial, Lynn quoted Fred as saying he "was not bringing them back." Fred testified he told Lynn, "I would send them back at Christmas time and in the summer we could turn our arrangements around."

About September 12, 1985, Lynn and Ed, unbeknown to Fred, arrived in Los Angeles by automobile. Enlisting the aid of the "District Attorney" and the "Sheriff's Department," Lynn secured custody of the boys. She and Ed then drove them back to Waynesville, stopping overnight at a motel.

There, Lynn and Ed shared a bed; the boys shared another bed in the same room.

Lynn testified that the night they reached Waynesville she received a phone call from Fred. Lynn's testimony: "He [was] ... rather angry and hostile, and told me that because of the embarrassment I had caused him with the police being there, embarrassing him in front of his neighbors, that he would make me pay; he would get even and if he ever got the children, that I would never see them again."

Lynn, it will be recalled, married Ed January 26, 1986, some seven weeks before she commenced this modification proceeding. Lynn conceded that Fred had asked for visitation during the summer of 1986, while the proceeding was pending, and that she had refused.

■ In considering Fred's first point, we are mindful that it was his burden to show that a change had occurred in the circumstances of the boys or Lynn since the Virginia decree, and that modification was necessary to serve the best interests of the boys. *Ryan v. Ryan*, 652 S.W.2d 313, 315[2] (Mo.App.1983); *Knoblauch v. Jones*, 613 S.W.2d 161, 165–66[2] (Mo.App.1981); § 452.410, RSMo 1986.

The first case cited by Fred in support of his first point is *In re Marriage of P.I.M.*, 665 S.W.2d 670 (Mo.App.1984). There, it is said that where there are charges and proof of gross immorality on the part of a custodial parent, and such immorality takes place in the home in which the child is kept, it is unnecessary to await manifestation of harmful consequences to the child before action is taken; it is more sensible to change a child's custody when there is a reasonable likelihood of an adverse effect on the child if he is kept in his present surroundings than to wait until damage is done and then attempt to repair it. *Id.* at 672[3].

Fred also directs our attention to *H___ v. H___*, 637 S.W.2d 432, 434[5] (Mo.App. 1982), for the proposition that in determining whether to modify a custody provision it is proper for a trial court to consider the morals and mode of life of the parties.

The final case on which Fred relies to support his first point is *M.L.G. v. J.E.G.*, 671 S.W.2d 312 (Mo.App.1984), which teaches that while no court can force a parent to observe any particular moral code, the moral fitness of a person seeking custody of a child is a proper subject for a court's consideration, and a critical factor is whether a parent's immoral behavior is conducted with the child's knowledge and while the child is present in the house. *Id.* at 315.

While the principles of *P.I.M.*, *H___*, and *M.L.G.* are undeniably sound, their facts are too dissimilar to those here for those cases to be controlling. In *P.I.M.* for instance, there was evidence that on one occasion at the mother's home an altercation between two of her male acquaintances resulted in a gunshot, that the mother and her two children made a trip with another of her paramours and the latter's teenage daughter during which the mother passed out after drinking wine, that on another occasion the paramour cursed the children during an argument, that the mother kept marihuana concealed in her bedroom, that she kept sexually explicit publications in a magazine rack that contained the youngest child's coloring books and crayons, that the mother kept a projector and hard-core pornographic films in her home, which she watched with her boyfriend during times when the children were banished to another room, and that the children saw the boxes containing the films, on which appeared sexually explicit color photographs.

In *M.L.G.*, the mother went out during the evening about twice a week leaving her daughter, a second-grader, alone until some time between 10:00 p.m. and 2:00 a.m. On one occasion the child was attempting to cook and a pan became overheated and began smoking, requiring assistance from a neighbor. The mother rarely arose in the morning to prepare the child's breakfast or see her off to school. During a two-year period the mother had five different men spend the night with her, and the child would see them in the morning before departing for school. On one occasion the mother took the child to the apartment of one of the mother's male friends and spent the night with him while the child slept elsewhere in the apartment.

In *H___*, the mother moved herself and her son into the home of her male friend. The child developed a habit of pulling hair from his head. There was psychiatric evidence that the child was filled with anxiety and anger focused primarily on his mother, and that he should be given immediate psychiatric care and transferred to the custody of his father in order that he not develop more serious neurotic problems as an adolescent and adult.

It is generally accepted that adultery, standing alone, does not require a change of custody of children from one parent to the other. *In re Marriage of F___*, 602 S.W.2d 227, 231[3] (Mo.App. 1980). It is only in those instances where the moral conduct of the offending spouse is so gross, promiscuous, open or coupled with other types of antisocial behavior as to directly affect the physical, mental, economic or social well-being of a child that a change is warranted. *Id.*

In the instant case there was no evidence that Lynn had neglected the nutritional, medical, educational or hygienic needs of the children. For the two and a half years immediately preceding trial Lynn had not been employed outside the home, thus there had been no necessity for others to care for the boys before or after school or on weekends. During the 1984–85 school year Lynn had served as a room mother at the school attended by the eldest boy. Lynn testified she and the boys attend church regularly.

As to Lynn's alleged refusal to allow Fred visitation with the boys after she and Ed brought them back from California, the evidence showed that she did indeed reject his request to take them to California during the summer of 1986. Fred acknowledged, however, that he was allowed to visit the boys "for a period of a few days" in September, 1986, and on three separate days prior to trial.

Citing *H___*, 637 S.W.2d at 434[4], Fred reminds us that interference by a parent with decretal rights of visitation is a factor that may be considered in determining the

welfare of a child and whether custody should be changed. Lynn, however, points out that a noncustodial parent's retention of custody of children contrary to court decree, and in violation of such parent's understanding with the custodial parent, can be the basis for denying modification. *Knoblauch*, 613 S.W.2d at 167[9]. Neither in the trial court nor here did Fred attempt to demonstrate that he had the legal right to keep the boys in California after school commenced in the fall of 1985.

It is also noteworthy that there is no evidence that Lynn ever thwarted Fred's visitation rights prior to 1986. Fred visited the boys at the home of Lynn's parents "in late December, '83, and spilled over into the first couple of days of 1984." That was just a few days after the parties had been divorced. Less than five months later, Lynn, as we have seen, delivered the boys to Virginia so Fred could take them for the summer of 1984. He kept them until after Labor Day that year, apparently without protest by Lynn. It was only after Fred refused to return the boys when school began in 1985 that Lynn denied his request for summer custody. While her denial cannot be ignored, it is substantially extenuated by Fred's arbitrary refusal to return the boys and his threat that if he got them again Lynn would never see them.

Additionally, the trial court learned from the evidence that inasmuch as Fred and Joanne were on duty on weekdays, the boys had been consigned to a "day care center" during their stay in California in 1985. Fred departs home about 7:00 a.m. on duty days; Joanne leaves about 15 minutes earlier, as her duty station is different than his. Fred disclosed that if he were awarded custody the boys would again be in a day care center before and after school hours until he could employ an adult female to take care of them in his home.

Fred's tour of duty in Los Angeles was scheduled to end around July 1, 1987, when he expected to be transferred to Fort McNair, Virginia, to attend the National War College. Fred explained that as it was Marine Corps policy that he and Joanne be assigned to the same geographic area, her tour of duty in California would end simultaneously with his. Obviously, awarding custody of the boys to Fred would have resulted in their changing schools in the middle of the 1986–87 school year, and changing again at the start of the 1987–88 school year.

■ The scope of our review of a judgment denying a motion for change of custody of a child is set forth in *F——*, 602 S.W.2d at 229[1]. The trial court's judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law.

■ While Lynn's cohabitation with Stewart and later with Ed (before marrying him), in households shared with her sons, is a strong factor favoring transfer of custody to Fred, we cannot ignore the fact that Lynn and Ed had been married almost a year at time of trial, thus the boys were not then occupants of a residence where Lynn was living in an illicit relationship with a paramour. In addition, we have noted there was no evidence that Lynn's care of the boys had ever fallen below acceptable standards or that she had ever shirked her parental responsibilities. There was likewise no evidence that the boys were maladjusted or that their emotional or behavioral development would be enhanced by placing them with Fred. The trial court was also mindful that awarding custody to Fred would mean that the boys would have to move from Missouri to California, and then to Virginia, in the space of six months. There is value in a child's being kept with the parent who has had custody for a long period of time, as against uprooting him and transplanting him in a new home. *Morrison v. Morrison*, 676 S.W.2d 279, 280 (Mo.App.1984); *Schmidt v. Schmidt*, 591 S.W.2d 260, 262[2] (Mo.App.1979).

At the end of the trial, the trial court, in the presence of the parties and counsel, commented on the evidence recounted above. While censuring Lynn for her two periods of extramarital cohabitation, the

trial court found nothing else in the evidence warranting a change of custody. The trial court observed that the periodic changes of station inherent in military service, coupled with the fact that neither Fred nor Joanne would be with the children during weekdays, weighed against a change in custody. Noting that Lynn would be home with the children on a daily basis, the trial court concluded that Fred had failed to demonstrate that modification was necessary to serve the boys' best interests.

We can and should indulge the presumption that the trial court considered all the evidence and decreed custody of the boys by what it believed to be their best interests and, in doing so, we must bear in mind that the trial court was in a better position not only to judge the credibility of the witnesses directly, but also the parties' sincerity and character and other trial intangibles which may not be completely revealed by the record. *K___ R___ (S___) D___ v. C___ D___ S___*, 646 S.W.2d 428, 431–32[6] (Mo.App.1983); *L___ E___ (S___) v. J___ A___ E___*, 507 S.W.2d 681, 683–84[4] (Mo.App.1974).

Having carefully studied the record, we cannot say that the judgment is unsupported by substantial evidence or is against the weight of the evidence, nor do we find that it resulted from an erroneous declaration or application of the law. We therefore deny Fred's first assignment of error.

■ Fred's second point avers the trial court erred in not allowing him to introduce evidence regarding the conditions existing in Lynn's home when Fred picked up the boys there in 1985. Fred maintains such evidence "would show the circumstances that the children were living in from the time of the last order in regard to ... custody ... and was, therefore, relevant and important information."

During Fred's testimony, his counsel asked, "Would you describe the conditions with the cabin where the children were when you picked them up in June of '85." An objection by Lynn's counsel on the ground of materiality was sustained.

Fred's counsel then asked, "When you picked up the children in June of 1985, what kind of physical condition were they in?" An objection by Lynn's counsel was sustained on the ground that the inquiry was "too remote."

Fred argues that the above rulings prevented him "from presenting highly critical facts ... during the period of time that was unquestionably before the Court." Lynn responds by pointing out that Fred neglected to make an offer of proof in the trial court showing what his testimony would have been had he been permitted to answer the questions.

An assignment of error regarding the exclusion of testimony cannot be considered on appeal in the absence of a showing in the trial court of what the testimony would have been and that it was relevant and material. *Moore v. Parks*, 458 S.W.2d 344, 348[6] (Mo.1970). The mere refusal to allow a witness to testify is not reversible error in the absence of such a showing. *Id.* The purpose of the requirement of an offer of proof is to make certain the trial court and opposing counsel understand what evidence is being offered and its relevancy and materiality. *State ex rel. State Highway Commission v. Northeast Building Co.*, 421 S.W.2d 297, 300[1] (Mo.1967). Additionally, an offer of proof enables appellate courts to understand claims of error. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 883 (Mo. banc 1985). A very narrow exception exists when (a) there is a complete understanding, based on the record, of the excluded testimony, (b) the objection is to a category of evidence rather than to specific testimony, and (c) the record reveals the evidence would have helped its proponent. *Id.* at 883–84[14]. The exception is inapplicable here, as the questions were about specific conditions and there was no understanding at trial as to what the excluded testimony would have shown. Consequently, Fred's second assignment of error has not been preserved for our review.

Before leaving the point, however, we note that later in the trial Fred was able to present evidence about the condition of

Lynn's home and the boys when he picked them up in 1985. Joanne, who had accompanied Fred on that occasion, was asked to describe Lynn's home. Joanne answered: "A small cabin, as I recall, four rooms counting the bathroom; was in the process of being moved out of. So there was a lot of disarray and the kitchen—the back door, the screen had a large hole, an exit-entrance for the various dogs. In the living room there was a litter of puppies underneath a heater-furnace. Just a lot of disarray and unkept condition."

Asked what she observed regarding the boys' physical condition, Joanne replied: "My observation was that their hair was very shaggy, as though it had not been cut for awhile, they had insect bites on their arms and legs and buttocks."

Nothing in the record suggests that Fred had any better opportunity than Joanne to reconnoiter Lynn's home and inspect the boys. It is thus inferable, absent an offer of proof, that his testimony would have been similar to Joanne's. That being so, any error in excluding Fred's testimony was of little moment, as an error in the exclusion of testimony on a particular occasion is considered harmless where testimony of similar import is subsequently introduced. *State v. Abbott*, 654 S.W.2d 260, 277[27] (Mo.App.1983); *State v. Foley*, 629 S.W.2d 401, 403[4] Mo.App.1981). Fred's second point is without merit.

■ Fred's third point complains that the trial court erred in reducing the amount of his visitation without making a finding that such visitation would endanger the boys' physical health or impair their emotional development. Fred bases this point on § 452.400.2, RSMo 1986, which provides:

"The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair his emotional development."

Fred maintains the trial court's amended decree restricted his visitation rights inasmuch as prior to it he had been "entitled to the children for the entire summer."

We remind Fred that the agreement incorporated in the Virginia decree did not award him any specific periods of temporary custody. It granted him only "the right of reasonable visitation." His temporary custody of the boys throughout the summers of 1984 and 1985 was by verbal agreement with Lynn, not because of any decretal entitlement.

In *Weinbaum v. Weinbaum*, 679 S.W.2d 384 (Mo.App.1984), a decree of dissolution of marriage awarded custody of the parties' children to the mother, with the father "to have right to have children visit him on reasonable occasions." For some two years thereafter the father had temporary custody of the children on alternate weekends and for a two-month period in each of two consecutive summers. Some three and a half years after the decree was entered, it was modified by deleting therefrom the provision awarding the father reasonable visitation rights and replacing it with a provision granting him temporary custody on the second and fourth weekends each month. On appeal, the father contended that the modification was invalid in that the court did not make the specific finding referred to in § 452.400.2. Rejecting the argument, the appellate court held that § 452.400.2 was inapplicable to the change from reasonable visitation rights to the specific rights of temporary custody and visitation detailed in the modification. *Id.* at 390[10].

In the instant case, the trial court's amended decree, in addition to spelling out the specific periods during which Fred was entitled to temporary custody of the boys, awarded him "reasonable visitation with said two minor children at all other times." In the latter respect, the trial court's amended decree paralleled the Virginia decree. Thus, Fred, while continuing to have the reasonable visitation rights he had always possessed under the Virginia decree, gained the temporary custody rights enumerated in the amended decree.

Fred maintains, however, that inasmuch as Lynn allowed him summer-long custody

of the boys in 1984 and 1985, she is deemed to have interpreted the "reasonable visitation" provision of the Virginia decree to mean that he was entitled to that amount of temporary custody each year. Thus, says Fred, the amended decree improperly restricted his visitation rights in that the trial court cut his summer custody to one month without making any findings per § 452.400.2. Fred concedes he can locate no Missouri custody case supporting his thesis.

We find Fred's premise unpersuasive. Lynn's willingness that Fred have the boys throughout the summers of 1984 and 1985 suggests nothing more than that she had no objection to such arrangement in those years. Such circumstances do not support an inference that Lynn believed the "reasonable visitation" provision in the Virginia decree *compelled* her to turn the boys over to Fred for a three-month period every year, and nowhere in the record is there any admission by Lynn that she placed that interpretation on the Virginia decree.

We hold that the Virginia decree did not entitle Fred to a three-month period of summer custody each year. Consequently, the trial court's amended decree did not impose a restriction on Fred's decretal visitation rights, and no findings were required under § 452.400.2. Fred's third point is denied.

■ Fred's final point is:

"... the trial court erred in not disqualifying or recusing [itself] after making remarks indicating prejudice against [Fred] when there was no evidence of misconduct by [Fred] as indicated by the judge and this would lead a reasonable person to conclude that the trial court had prejudged the matter or had otherwise made up its mind without hearing the evidence and gave a reasonable person cause to doubt the impartiality of the trial judge, especially considering other remarks and rulings by the court."

The background of this point is that Fred testified Joanne "babysat" the boys on two occasions while he was stationed in Okinawa from June, 1982, to June, 1983. Fred explained, "[Joanne] wrote to me and told me she kept the boys overnight while Lynn was going out somewhere."

During Lynn's testimony, Fred's counsel asked her how large her place of residence was in Devils Elbow. Lynn's counsel objected that the inquiry was irrelevant. While Fred's counsel was arguing relevancy, the trial court interrupted with this remark: "Overruled. I'll let her answer. But I want you both to know the Court wasn't born yesterday. I'm aware there was probably a relationship between this gentlemen [sic] and his wife before they were married, according to looking at the papers and the date of divorce and so on, and for her sitting with the children while he was in Okinawa. I wasn't born yesterday."

Fred maintains the above comment, being unrelated to the issue under debate at the time it was made, indicates that for some unknown reason the trial court entertained some sort of prejudice against him.

We disagree. The fact that Joanne had written Fred about keeping the boys while he was overseas, coupled with the fact that Fred had married Joanne thirty days after his divorce from Lynn, supplied a reasonable basis for the trial court to infer that a personal relationship of some sort had begun developing between Fred and Joanne while Fred was still married to Lynn.

Subsequent evidence confirmed the trial court's instincts. Later in the trial Fred testified he first met Joanne in 1980, and that some time later he and she were assigned to the same office for a year and a half before he left for Okinawa. During the mutual assignment, Joanne visited socially in the home of Fred and Lynn. Joanne, during her testimony, admitted she and Fred were "dating" during the time his divorce action with Lynn was pending. Joanne denied, however, that she and Fred lived together before their marriage. Fred's testimony corroborated Joanne's on that point.

We find the trial court's comment nothing more than the expression of a reasonable inference the trial court drew from the evidence. Contrary to Fred's assertion, the

comment did not demonstrate that the trial court was prejudiced against him. Additionally, we remind Fred that the trial court's comment came immediately after a ruling favorable to Fred on an objection by Lynn's counsel.

■ Another comment by the trial court that, according to Fred, revealed prejudice against him came during the trial court's recapitulation of the evidence. During final argument, Fred's counsel had argued that Lynn had committed "acts of open immorality," one of which was sleeping with Ed in the motel in the boys' presence during the 1985 trip back from California. Reviewing that aspect of the evidence, the trial court said: "... you take the children and violate a Court order and kept the children in the State of California and tell your wife, 'I'm not going to let you have them back.' Then she goes out there and gets them and brings them back and then she has to have some type of assistance and this is one of the things which you want her criticized for, and rightly so. I think she's subject to criticism for spending the night in a motel with a man who is not her husband, but you're really the responsible one for that."

As the excerpt shows, the trial court was critical of Lynn for sharing a bed with Ed in the room with the boys, but was likewise critical of Fred for his arbitrary refusal to return the boys to Lynn, which necessitated her journey to California to retrieve them.

Fred seizes upon other comments by the trial court that, by Fred's reckoning, indicate prejudice. We have carefully studied them all, and have concluded that they do not, either individually or collectively, constitute factual grounds to cause a reasonable person to doubt the trial court's impartiality. *In re Marriage of Burroughs*, 691 S.W.2d 470, 474 (Mo.App.1985); *Berry v. Berry*, 654 S.W.2d 155, 159 (Mo.App.1983).

The trial court, in its evaluation of the evidence, made a well-intentioned, if perhaps blunt, explanation to the litigants as to why the trial court had decided to deny Fred's motion for change of custody.

■ The mere fact that rulings are against a party, per se, does not show bias or prejudice on the part of the trial court. *Butler v. Butler*, 698 S.W.2d 545, 550 (Mo.App.1985); *In re Marriage of Ryterski*, 655 S.W.2d 102, 104[8] (Mo.App.1983). The fact that the trial court in the instant case, after reviewing and weighing the evidence, resolved the issues adversely to Fred does not demonstrate prejudice. While Fred may be disgruntled by the outcome of the litigation, the record fails to establish bias against him by the trial court.

Fred's final point is denied and the amended decree is affirmed.

GREENE, P.J., and HOLSTEIN, J., concur.