Jack SHELTON, Appellant,

v.

Dorothy Jo (Shelton)
PATTERSON, Respondent.

No. WD 41423.

Missouri Court of Appeals,
Western District.

Sept. 26, 1989.

Jeffrey S. Eastman, Kansas City, for appellant.

Elizabeth Stitt, St. Joseph, for respondent.

Before GAITAN, P.J., and
MANFORD and ULRICH, JJ.

GAITAN, Judge.

This appeal derives from a motion to modify a 1986 decree of dissolution filed by appellant, Jack Shelton, wherein he sought custody of the minor child, Amy Jolene. The trial court directed a verdict and entered judgment in favor of respondent, Dorothy (Shelton) Patterson at the conclusion of appellant's evidence. We affirm.

These parties were married in June, 1982, and one child, Amy, was born on August 7, 1983. The marriage ended by uncontested divorce granted in Val Verde County, Texas. At the time of the filing of the petition the parties resided in Texas as a consequence of appellant's military service. Both parties had moved from the state of Texas by the time the divorce was granted on August 4, 1986. As a consequence of the divorce and separation agreement, respondent received custody of the minor child and appellant was afforded certain specific visitation rights which included every other weekend and every other holiday. Pursuant to this agreement, appellant made child support payments of $125.00 per month through the District Court in Val Verde County, Texas.

After his discharge from the service, appellant resided at his mother's house at 1423 Northern in Independence, Missouri on May 17, 1986. He lived with his mother until moving to an apartment about July 1, 1986. Appellant began working as a fueler for Ogden Allied at the Kansas City Airport on May 28, 1986. It is undisputed that respondent, without either appellant's consent nor that of the court, removed herself and the minor child from Texas. Respondent moved to Grant City, Missouri to her parents' home. This occurred the latter part of April, 1986.

The appellant testified that he attempted to see Amy after he returned to Independence, Missouri. Appellant testified he then drove up to their house on his next day off and found no one home. He testified that it appeared no one had been there for a while because the weeds were starting to grow. Appellant also testified he did not write to them to tell them he was coming for a visit. His reason was that he does not like to write; he would rather talk to somebody in person or call. Apparently he called, but got no answer.

The appellant testified he next heard from the respondent via a letter in June in which respondent informed him of dates on which she would be in four towns in Nebraska in the month of June. The letter appears to be postmarked on June 2, 1986 and was mailed to appellant at his mother's address. The letter stated that appellant could call the town sheriff to leave a message for respondent to call him. Apparently, this procedure was used by respondent to contact her parents when they traveled with the carnival. Although the letter contains no reference to traveling with a carnival, the appellant testified that is what the respondent was doing.

The appellant testified that he attempted to call the sheriff in Pender, Nebraska, the last location in the letter, to see his daughter. No arrangements were made as a result of that conversation. Appellant testified that he felt future contacts with the sheriff's office were not a viable means to see his daughter.

The appellant received a second letter from respondent. This letter also was sent to the appellant at his mother's address. The letter was dated June 13, 1986 and set out the rest of respondent's summer tour. The letter stated they would mostly be in Nebraska but could be reached through the sheriff's office. This letter informed appellant of the thirteen locations the respondent and Amy would be at from July 2 through September 14, 1986. Although the towns were mostly in Nebraska, the last four towns were in Missouri. This letter was postmarked June 14, 1986 and gave respondent's return address as P.O. Box 345, Grant City, Missouri.

The appellant received a Father's Day card from the respondent. He next heard from respondent about the end of June when he talked to her on the telephone. The respondent inquired whether appellant received the card. Appellant testified that he told respondent during this conversation his dislike for his child traveling in a carnival and that the respondent stated, "I don't see anything wrong with it." Appellant testified he expressed a desire to have his daughter for at least a week and was told that he could have her from a Friday night at six until Sunday at six, which were the terms of the settlement agreement which was to be incorporated in the divorce decree. Appellant testified that he was not able to visit per the terms of that agreement at the time because he was on probationary status for 60 days after the date of his hiring by Ogden Allied on May 28, 1986. He felt that requesting a specific weekend off would jeopardize his employment during this 60 day period.

Appellant and his mother sent a present to Amy for her birthday on August 7, 1986. This present was sent to the Grant City address. He received an acknowledgment of that gift. Respondent had to call appellant's mother because she did not have his phone number. Appellant next spoke with respondent around the first of September. His mother had received a phone call from her in which respondent gave a telephone number for appellant to call her. Appellant testified he believed this telephone call came from Oklahoma. Appellant testified he returned the call and again requested to have Amy for a week or two but that respondent said he could come down there and visit according to the terms of the decree. Appellant testified that he did speak with Amy, but that he did not call that number again to visit with Amy or to see how she was doing.

The next communication from respondent that appellant received was a letter dated October 20, 1986 mailed from Oklahoma City. The letter was addressed to appellant at his mother's address. Respon-

dent stated they were no longer with the carnival but were in Oklahoma City, Oklahoma. Respondent wrote that she had been trying to get hold of appellant and left a phone number with his mother. Respondent also included a telephone number where appellant could call respondent. Respondent also enclosed news about Amy. Respondent included her return address on the envelope and the letter.

Appellant never wrote to Amy at this address or any other address apparently because he does not write. He also testified that he never called to set up a time for respondent to call him because he didn't know his work schedule more than one day in advance. At that time appellant still had not given respondent the telephone number for his residence.

Appellant next spoke with respondent in January of 1987. His mother lives just a block from respondent's Aunt Mickey in Independence. He testified he was "just driving by" the house and saw respondent. He testified he offered to watch Amy while respondent and her husband looked for jobs, but that respondent stated Amy was with her parents. He testified she said no when he offered to drive up and get her.

Appellant saw his daughter for an hour in February. He was in the hospital as the result of knee surgery. The respondent called his mother to see if appellant wanted to see Amy before she left town. His mother brought Amy to see him as he was coming out of the anesthesia. Appellant's wife, Brenda, testified there was nothing noticeable about Amy's appearance at that time. She testified Amy did have chapped lips.

Appellant next saw Amy at the end of February 1987 when respondent called his mother to see whether appellant wanted to have Amy overnight. He exercised that visitation. He testified that Amy was wearing a coat he had given her when she was two years old, her hair was filthy, her lips were chapped and she had white blisters in her mouth. Amy was approximate-ly 3½ years old at this time. He thought she looked like she had not had a bath for a week. He testified his wife gave her a bath and washed her hair three times, and suited her with new clothes. They had new clothes for her because they had saved her Christmas presents.

The appellant next saw Amy in November of 1987 as a consequence of a phone call from the respondent to his mother who in turn called appellant at work.[1] Appellant took the rest of the night off and picked Amy up at the house of respondent's Aunt Fern on November 15. Respondent asked if he could have Amy for several days. Appellant testified he talked respondent into letting him have Amy through Thanksgiving.

Appellant testified when he got Amy on the 15th of November that she was wearing a boy's coat that was too big for her, her blouse was down past her knees; she was filthy with chapped lips, and white blisters all over her gums; and her hair was tangled and messy.

Appellant received a letter from the respondent dated March 18, 1988. This letter had a return address in Unionville, Missouri and was mailed to appellant at his mother's address. In this letter respondent advised appellant he should get tested for herpes; if he tested positive his wife and children should be tested, along with anyone else appellant had been with in the last three or four years. Respondent informed appellant that she was going to have Amy checked for herpes and mono around the first of April. Respondent wrote that he should let her know if he wanted to know the test results.

Appellant did not attempt to contact respondent regarding the results of Amy's tests. He testified he talked to his attorney and filed this motion to modify was filed on May 16, 1988.

In reviewing a judgment denying a motion for change of custody, the trial court's judgment will be sustained unless it errone-

---

1. Appellant testified he had not given his work or home number to respondent prior to this time because she used to call him at work in the service and "bug" him. He made arrangements for respondent to get hold of him at work in the event of an emergency by calling his mother.

ously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976); *Betterton v. Betterton*, 752 S.W.2d 417, 418 (Mo.App.1988). At the close of appellant's case respondent moved for a directed verdict ordering that petitioner's motion to modify as to the custody of the child be dismissed. Respondent argued that appellant failed to sustain his burden of showing "[t]hat there has been a substantial continuing change of circumstances to warrant a change of custody at this time." The court stated it was "of the opinion that there is not sufficient evidence from the petition in this case to justify a change or modification of custody."

■ In ordering a change of custody the court must find upon the basis of facts that have arisen since a prior decree that a change has occurred in the circumstances of a child or his custodian and that a modification is necessary to serve the best interest of the child. *Friend v. Jackson*, 714 S.W.2d 953, 955 (Mo.App.1986); Section 452.370 RSMo.

■ In the instant case, the court found there was not "sufficient" evidence to justify a change of custody.

No findings of fact or conclusions of law were made in this case. Where none are made, all facts are deemed to be found in accordance with the result reached. *Ellis v. Ellis*, 747 S.W.2d 711, 714 (Mo.App. 1988). Upon the review of the actions of the trial court it is presumed that the court examined the evidence thoroughly and ordered what it thought to be in the best interest of the child. *Id.* at 714. The trial court is in a better position to judge the credibility of witnesses and persons directly, their sincerity and character and other trial intangibles which may not be completely revealed by the record. *K–R–S–D v. C–D–S*, 646 S.W.2d 428, 432 (Mo.App. 1983); *Wilhelmsen v. Peck*, 743 S.W.2d 88 (Mo.App.1987).

The evidence did establish that respondent traveled with her parents and Amy with a carnival during the first summer of separation and divorce, from June 5 into September of 1986. Respondent remained in constant written and verbal contact with appellant. Respondent's first letter to appellant gave instructions on how to contact her. The trial court could have inferred that appellant knew of the family's past summertime activities, knew their plans for the summer of 1986 and tacitly approved those plans at the time of the divorce. He certainly could have objected in time to prompt changes in the decree since it was not final during most of this period.

During the period of travel and the move to Oklahoma, respondent kept in touch with appellant through telephone calls and letters. She kept appellant apprised of Amy's progress and informed of their addresses. When possible she provided appellant with a phone number. Respondent made every effort under the circumstances to be truthful and straight forward with appellant. However, appellant lied to respondent about his place of employment. He told her he was working for McDonalds. Even when he had a phone number or address, appellant never took the initiative to call or write to Amy in an effort to maintain his parent-child relationship. The trial court could have doubted appellant's sincerity in desiring to maintain that relationship. If he objected to the removal and subsequent travel by the respondent with the minor child, he easily could have objected to the court and petitioned for custody at that time.

Appellant testified he did not at any time ever ask respondent for her address. He also did not provide respondent with his home address and phone number, even though he had not been living with his mother since July of 1986. Appellant also gave several different reasons for not giving his work number to respondent, such as it was easier for his mother to reach him or respondent used to "bug" him at work in Texas.

■ At the time of the divorce, respondent was a fit person to have custody of the minor child. She traveled with Amy for four and one-half months. Although removal of a child from the state is a factor to consider in a motion to modify custody, it is not grounds per se. *Dohogne v. Dohogne*, 720 S.W.2d 421, 424 (Mo.App.1986). In *Wilhelmsen*, a mother had lived with two different men in households shared

with her sons. The court considered this a strong factor favoring transfer of custody, but did not do so, noting that at the time of trial the mother had been married nearly a year to her second boyfriend. *Wilhelmsen v. Peck*, 743 S.W.2d at 94. In the instant case, respondent had been in the state of Missouri since January of 1987, for 15 months prior to the filing of the motion to modify, mitigating this factor for a change of custody. The trial court could properly view this absence from the state as not being sufficient to justify a change of custody. This is especially true given the appellant's less than enthusiastic attempts to maintain a relationship with the minor child.

Appellant's alleged concern for Amy's health never was acted upon. While he expressed concern for her physical well-being, he did not take her to a physician. Further, it seems his concern did not extend to reviewing her medical records. The record does indicate she did not have herpes as suspected. It can be gleaned from the record that the respondent continued to be a fit person for the care of that child.

The judgment of the trial court is affirmed.

All concur.