Carol Jeanne JONES, Appellant,

v.

David Allen JONES, Respondent.

No. 20884.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 12, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 3, 1997.

Application to Transfer Denied
Feb. 25, 1997.

Laurette Tedders, Urbani, Marshall & Tedders, P.C., Roseville, MI, for appellant.

Walter E. Williams, Joplin, for respondent.

PARRISH, Judge.

Carol Jeanne Jones (Mother) appeals an order modifying custody of her son, Clinton Joseph Colter Jones (Colter). The trial court transferred custody of Colter to David Allen Jones (Father). This court affirms.

Mother and Father's marriage was dissolved November 7, 1991. The parties had two children, Zachariah Hunter Jones (Zach), born September 18, 1977, and Colter, born February 16, 1990. Mother and Father were awarded joint legal custody of the children. Mother was awarded primary physical custody. Husband was granted specified "[m]inimum visitation rights." The original decree was modified in March 1993 with respect to the older child, Zach. Physical custody of Zach was awarded to Father.

Father sought a second modification of the custody order in December 1994. He filed a motion to modify the dissolution decree in which he alleged change of circumstances with respect to Mother's residence and Colter's environment. Father alleged Mother was not providing adequate care and supervision for Colter. He sought custody of Colter.

After holding an evidentiary hearing, the trial court modified the dissolution decree. The trial court found that Zach was emancipated. It awarded custody and control of Colter to Father. Mother was granted "reasonable visitation" with Colter including specified periods of visitation.

The trial court's "Judgment Order of Modification" includes findings with respect to the award of custody to Father. It determined that Colter was five years old at the time of the hearing. The findings include:

> The Court finds that the mother has had this five year old son in her custody and who was in her home while she entertained men to whom she was not married. That the mother and her men friends shared the same bed while the five year old boy was

present in her home, and that she also took the five year old boy with her while she engaged in the same activity in their place of abode. This appears to be a pattern of the mother's activity. Further many of the men with which the mother was consorting had extensive criminal records.

The parties [sic] oldest son, now emancipated, testified that one of the mother's men friends attempted to get him to make a fraudulent application for a credit card. The mother took the five year old son to visit one of her men friends while he was in jail. The mother testified that her latest man friend was sentenced in United States District Court in Springfield, Missouri on the day before the last hearing on this case to a term of six years.

This court's review of child custody orders is undertaken in accordance with Rule 73.01(c). The judgment of the trial court will be affirmed unless it is unsupported by substantial evidence or is against the weight of the evidence, or unless it erroneously declares or applies the law. *Boschert v. Boschert,* 793 S.W.2d 495, 496–97 (Mo.App.1990). The power to set aside a judgment as against the weight of the evidence is exercised with caution and only when an appellate court is possessed with a firm belief that the judgment is wrong. *Id.* at 497.

In reviewing a child custody order, this court presumes the trial court reviewed all the evidence and awarded custody in the manner it believed would be in the best interests of the child. *Id.* "This presumption is based upon the trial court's better position to judge not only the credibility of the witnesses and parties directly but also their sincerity, character, and other trial intangibles which might not be completely revealed by the record." *Hartig v. Hartig,* 738 S.W.2d 160, 161 (Mo.App.1987).

Mother's first allegation of trial court error is directed to the trial court's finding that a change had occurred in her circumstances as Colter's custodian. *See* § 452.410.1, RSMo 1994. She contends the finding of changed circumstances was based on "the Noncustodial's [sic] Parent's alleged changed circumstances and based upon the Custodial Parent's alleged association with AfricanAmerican [sic] men and/or men with 'extensive criminal histories'." She alleges (a) "[t]he Trial Court improperly used the Mother's alleged Association with 'Black' Men to Support a finding that a Modification in Custody was Necessary, violating the Mother's state and federal constitutional rights"; and (b) "[t]he trial Court violated the mother's federal and state constitutional rights by removing the minor child from her physical custody because the mother alleged [sic] was associating with 'black' men."

Testimony at the evidentiary hearing was that Mother had three men living with her in her home at different times. All were identified as black men and all had criminal records. On cross-examination, Father admitted having made racist remarks concerning the men who had been living with his former wife. He stated he made the remarks in anger and apologized for them.

References to men who had lived in Mother's home were made in closing arguments. Mother's attorney told the trial court, "This is a case about race." He argued, "This whole thing has been black, black, black. This man is a racist." In rebuttal, Father's attorney told the trial court Father's concern wasn't that his former wife dated black men, but that she dated men with felony convictions.

The trial court addressed the allegations of the parties in its modification order. Before making findings concerning custody, the trial court stated:

The father in his motion and during the testimony charges that the mother has had associations with many men who have lived with her from time to time with the young son living in the home. Further the allegations and testimony shows [sic] that some of the men had extensive criminal records and that many of the men are black men. Both the Petitioner and Respondent are white. The testimony of the father was that most of the men that the mother was associating with were black. The mother presented testimony that the father had made racist statements, and mother's attorney accused him of being a racist, and calling the mother's men

friends by racial slurs. This Court believes that such conduct and speech is improper, unseemly, and has no place in Court in determining where a child of tender years should reside. The Court will therefore decide this case as if race was not a factor, and that all the parties were of the same race.

Mother relies on two cases for her claim that the trial court improperly used her association with "black men" to support a finding of change of circumstances that required a change of custody; *Johnston v. Johnston*, 573 S.W.2d 406 (Mo.App.1978), and *Cantrell v. Adams*, 714 S.W.2d 211 (Mo.App.1986). She cites them for the proposition that a criminal conviction of a parent or of a step-parent cannot be a basis for rewarding or punishing a custodian in a child custody proceeding. She correctly states, "Clearly, if a trial court cannot punish a mother [or a step-parent] for their own criminal conviction as held in *Johnston* and *Cantrell*, the trial court in the present case may not punish mother Carol Jeanne for her *alleged* friendships with AfricanAmerican [sic] men or other individuals who allegedly had been convicted of a crime."

*Johnston* was a proceeding in which a father, Roger Johnston, sought to modify a custody award. His former wife, Emma Johnston, had custody of the child of the parties by reason of the custody award in a decree in a dissolution of marriage proceeding. Roger sought custody after Emma was convicted of delivery of a controlled substance, a felony. After an evidentiary hearing, the trial court that heard the motion to modify stated that modification was granted to award Roger custody "[i]n view of the crime (of, sic) which Mrs. Johnston was convicted, ... and also the uncertainty as to the child's future because of [Emma's] five years on probation." 573 S.W.2d at 409.

The court determined that the trial court had not permitted a record to be made of all proceedings, as requested by Emma; that it was necessary to reverse the order changing custody and to remand the matter for a new trial. In discussing the lack of record concerning the child's well-being the court stated, "The law is clear that custody proceedings may not be used to reward or punish a parent." *Id.* at 412. The court concluded that the trial court's action in denying Emma's request for a record to be made in certain parts of the proceeding and its denial of visitation rights for her demonstrated a punitive pattern.

In *Cantrell*, a father, William Cantrell, appealed the denial of his motion to modify a custody award. At the time of the hearing, Cantrell's former wife, Juanita Adams, was married to a man who had spent 32 days in jail and possibly had a drinking problem before the marriage. After William Cantrell and Juanita Adams were divorced and before she married Mr. Adams, Juanita had lived with men to whom she was not married. She had most recently lived with the man to whom she was married at the time of the hearing. The court, in affirming the trial court's denial of the motion to modify, found that Cantrell had failed to examine Mr. Adams' jail time in the course of the hearing and that there was no evidence he was an alcoholic. The court concluded that there had not been a showing that he was an unfit step-parent.

Although the principles for which Mother cites *Johnston* and *Cantrell* are apropos to this appeal, the record in this appeal is significantly different from the facts in those cases. Here there is a complete record of the hearing before the trial court, and the evidence reveals facts unlike those in *Johnston* and *Cantrell.*

Evidence revealed, and the trial court found, that Mother had a series of live-in male friends while Colter was in her home. There was evidence that many of her male friends had felony records and, in some instances, were awaiting trial or sentencing on current charges. There was evidence that when Colter would awaken in the night and go to his mother's bed, a male friend would leave her bed and go to a couch. Mother was asked the following questions and gave the following answers.

Q. Well, sometimes when he'd come to your bed when you were sleeping there with Vincent, you said Vincent would get up and go to the sofa, is that true?

A. That's correct.

. . . . .

Q. So, no question about it, Colter would see you and Vincent sharing the same bed, isn't that so?

A. That is.

Q. He could walk right in there and say, "Mom, I can't sleep," or whatever, and Vincent would get up out of your bed and go to the other room?

A. He would, he would wake up. He would come into my room kind of halfway in his sleep. Vincent would get up, go to the couch, and Colter would lay beside me.

Q. Okay. So he'd see Vincent sharing your bed, isn't that so?

A. I guess that is so.

Q. Now, previous to Vincent, you dated a fellow named Joe Jones, didn't you?

A. Yes, I did.

. . . . .

Q. And you started having Mr. Jones spend the night at your home, didn't you?

A. Started having him?

Q. Well, he spent the night at your home?

A. A couple nights, yes, he has, yes, he did.

Q. And Colter was present in your home when Mr. Jones spent the night there, is that true?

A. Yes, that is true.

Mother also testified that she met another man, Andrew Newman, at a club, the Red Lion. After she dated him, Newman was convicted of armed robbery. Newman spent nights in Mother's home while Colter was there. Mother got pregnant by Newman and terminated the pregnancy.

The trial court found that having men to whom Mother was not married in her home overnight had become a pattern of her activity. The trial court further found that many of the men had extensive criminal records.

Additionally, although both parents had a history of using controlled substances, Mother's attitude remained tolerant concerning their use. The emancipated child, Zach, told the trial court that his mother had given him money to buy marijuana for her and that she had smoked the marijuana in front of him. He said Mother smoked marijuana as an "everyday occurrence" the summer before the hearing—the hearing was held on September 27 and October 3, 1995.

Mother denied buying marijuana to smoke. She was asked, "So what's the occasion that you would use or smoke marijuana?" She answered, "If I was out with someone or at a get-together and someone had one, then I would probably take a hit off of it."

Mother's claim that the trial court improperly used her association with black men to support a finding that a change of circumstances occurred warranting a change of custody is not supported by the record. The trial court based its finding of change of circumstances warranting a change of custody on Mother's conduct. It found she had established a pattern of openly sharing her home and bed with men to whom she was not married, several of whom had extensive criminal records; that this occurred in Colter's presence.

■■■■ A trial court may properly consider moral fitness in determining child custody issues. *M.L.G. v. J.E.G.*, 671 S.W.2d 312, 315 (Mo.App.1984); *L.H.Y. v. J.M.Y.*, 535 S.W.2d 304, 307–08 (Mo.App.1976). A mother's conduct of affairs with the knowledge of children and while they are present in the house has been held to be a critical factor in denying her custody. *In re Marriage of J.H.M. and E.C.M.*, 544 S.W.2d 582, 585 (Mo.App.1976). "[P]rivate personal conduct by a parent which could well have an effect on children during the years in which their character, morality, virtues and values are being formed cannot be ignored or sanctioned by courts." *M.L.G. v. J.E.G., supra,* quoting *L.H.Y. v. J.M.Y., supra,* at 308.

The second part of Mother's first allegation of trial court error asserts the trial court violated her "federal and state constitutional rights by removing the minor child from her physical custody" because she allegedly associated with men not of her race. She cites two cases in support of her claim; *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), and *Miller v. Johnson,*

—— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

*Palmore* was a Florida custody case. The father sought a change of custody based on his former wife's cohabitation with a black man she later married. The father also remarried. The state trial court determined there was no issue concerning either party's devotion to the child, the adequacy of housing facilities or the respectability of either parent's new spouse.

It acknowledged that the father resented the mother's choice of a black partner but stated that the resentment was not a factor that permitted a change of custody. It found, nevertheless, that if the child were permitted to remain with her mother, when she attained school age and became more vulnerable to peer pressures, it would be inevitable that she would "suffer from the social stigmatization that is sure to come." 466 U.S. at 431, 104 S.Ct. at 1881. A state appellate court affirmed the trial court judgment without opinion. Certiorari was granted by the Supreme Court of the United States.

The Supreme Court reversed the state court. It held that racial stigmas relative to mixed racial association between a custodial parent and a third person would not justify removing a child from the custody of its natural mother so long as the mother was "found to be an appropriate person to have such custody." *Id.* at 434, 104 S.Ct. at 1883.

*Miller* is not factually similar to this appeal. It was a state congressional districting case. The court, in holding that a redistricting plan violated equal protection rights, declared, "The Equal Protection Clause of the Fourteenth Amendment provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const., Amdt. 14, § 1. Its central mandate is racial neutrality in governmental decisionmaking." —— U.S. at ——, 115 S.Ct. at 2482.

■ In this case, the trial court found Mother's circumstances had changed since the last custody hearing. The environment in which the child was kept was harmful due to the moral climate attributable to Mother's series of affairs with unmarried men in the household in which the child resided, and due to the criminal propensities of some of the individuals she regularly entertained. The trial court found that, based upon these conditions, Mother was not an appropriate person to have custody of Colter. This determination, unlike the one in *Palmore*, was not based on Mother's association with persons of a race different from hers. It was based on Mother's conduct. Point I is denied.

■ The remaining allegations of trial court error do not comply with requirements of Rule 84.04. They, therefore, present nothing for appellate review. *Luna v. Smith*, 861 S.W.2d 775, 781 (Mo.App.1993).

Rule 84.04 specifies the manner in which trial court error must be alleged. As explained in *Bentlage v. Springgate*, 793 S.W.2d 228, 229 (Mo.App.1990), the rule requires that points relied on contain three things: "(1) a statement of the action or ruling of the trial court about which the party complains; (2) a statement that specifies why the ruling was erroneous; and (3) a statement informing the appellate court wherein the evidence at trial supports the position the party asserts the trial court should have taken." Stating only abstract statements of law without showing how they are related to any action or ruling of the trial court does not comply with the rule. *Id.* *See* Rule 84.04(d).

Mother's Point II states:

The changed circumstances of the non-custodial parent is not a basis upon which physical custody can be wrested away from the mother, in that such consideration denies the mother equal protection of the laws.

This, at most, is an abstract statement of law. It does not specify how the declaration relates to any action of the trial court. It does not comply with Rule 84.04(d). It preserves nothing for appellate review. *Farm Credit Bank of St. Louis v. Jensen*, 844 S.W.2d 132, 133 (Mo.App.1993). This court, nevertheless, has looked to the argument portion of Mother's brief to ascertain the basis for her complaint and to determine if the trial court committed plain error affect-

ing substantial rights that may have resulted in manifest injustice or a miscarriage of justice. *Hoffman v. Koehler*, 757 S.W.2d 289, 292 (Mo.App.1988).

Mother appears to be contending with respect to Point II that the trial court looked to a "change of circumstances" of Father, the non-custodial parent, in modifying custody rather than to a change of custody with respect to her. Section 452.410.1, RSMo 1994, provides that a prior custody order shall not be modified unless the court finds "a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child."

■ This court finds no error, plain or otherwise, in the trial court's review of the circumstances of Mother and those of Father. The circumstances of Mother and the child changed due to the environment to which Colter was subjected in Mother's home. In ascertaining what was in his best interests, the trial court appropriately looked at Father's present circumstances and the extent that they had changed since the prior custody award. Father had married, was maintaining a home with a wife and stepchild. Although Father had, in the past, engaged in conduct that made him less than a model parent, his present circumstances were conducive to a favorable family environment for Colter, whereas Mother's were not.

The circumstances that had changed so as to warrant modification of the prior custody decree were those of the custodial parent, Mother. Point II is denied.

Mother's Point III states:

The trial [court] denied [Mother] equal protection of the laws by alternatively misinterpreting the case upon which it relied in its Order changing custody in a veiled attempt to eliminate "race" as its basis for removing the minor child from the mother's physical custody.

Point III does not comply with Rule 84.04(d). It does not state the action or ruling of the trial court about which it complains. It yields no clue as to wherein evidence at trial supports a position other than that taken by the trial court in its determination of the case. Again, a review of the record for plain error revealed none. Point III is denied.

Point IV states, "The Welfare of the Child requires the Bond be set and the status quo, prior to the entry of the trial court's Order of Modification, be maintained." Point IV states no action or ruling of the trial court about which a complaint is made. As with respect to Points II and III, it preserves nothing for appellate review. It fails to provide even a hint of anything that could be reviewed for plain error. It is denied.

The "Judgment Order of Modification" is affirmed.

CROW, P.J., and SHRUM, J., concur.