**Scherry Allen SMEAD, Plaintiff-Appellant,**

v.

**Rex Benny ALLEN, Defendant-Respondent.**

**No. KCD 29753.**

Missouri Court of Appeals, Western District.

April 30, 1979.

---

**94**

Floyd L. Sperry, Jr., Independence, for plaintiff-appellant.

William D. Piedimonte, Independence, for defendant-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

After a hearing upon respondent father's motion to modify a decree with respect to child custody, held July 28–29, 1977, the Circuit Court of Jackson County ordered the custody of Rodney Eugene Allen, nearly 11 years of age, transferred from his mother, the appellant, to his father.

Appellant complains of the admission into evidence of written reports of investigators for the Jackson County Juvenile Court and the Orange County (California) Probation Department. The reports had been ordered by the court under the authority of § 452.390, RSMo Supp. 1975.

In admitting these reports, the court was in error. *In re Marriage of Cavitt*, 564 S.W.2d 53 (Mo.App.1978), decided since the hearing in this case.

Appellant then says that, without the reports, the judgment of the court was not supported by substantial evidence and that we should therefore reverse the judgment. She thus recognizes that the admission of improper evidence is not in itself grounds for reversal in a court-tried case—at least where, as here, the improper evidence does not appear to have played a critical role in the court's decision. Rule 73.01; *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We will put aside the investigation reports which ought to have been rejected and will determine whether, without them, there remains substantial evidence to support the judgment of the court. *Menos v. Hodges*, 499 S.W.2d 427, 429 (Mo.1973); *In re Marriage of Cavitt*, 564 S.W.2d at 57.

We acknowledge the rule that a child custody decree may be modified only upon the showing of a significant change of circumstances occurring since the decree was made. *Villaume v. Villaume*, 564 S.W.2d 290, 302 (Mo.App.1978); *Blair v. Blair*, 505 S.W.2d 444 (Mo.App.1974); *Kennedy v. Carman*, 471 S.W.2d 275, 288–289 (Mo.App. 1971). (In our case, as we shall see, it makes no difference whether we take as a base date the time of the original decree in

1967, or the 1973 modification based upon the parties' stipulation. The evidence takes us back only to 1973.) We acknowledge also a second rule, more basic than the first, that the welfare of the child is the paramount consideration in child custody cases. *In re Shepler*, 372 S.W.2d 87, 90–91 (Mo. banc 1963).

In this case, leaving out the disputed reports altogether, and bearing in mind the rules recited in the preceding paragraph, we find abundantly substantial evidence to support the judgment of the trial court. We will now state the facts of the case, which we have drawn from the properly admitted evidence:

The father, Rex Benny Allen, and the mother, Scherry, were divorced in 1967 when Rodney was a little past one year of age. The original decree gave Rodney's primary custody to Scherry. The decree was modified upon stipulation of the parties December 27, 1973, giving to the father Rodney's temporary custody until June, 1974, and giving him permission to take the child to the State of California. The maternal grandmother seems to have initiated this change. That arrangement was continued indefinitely until Rodney's return to Missouri to visit his mother and grandparents in the summer of 1976.

In August, 1976, Rodney was sent to Missouri to visit his mother and his maternal grandparents—as in the summers of 1974 and 1975, when he had spent most of the summer with the grandparents. The grandparents lived in Independence. After the 1976 summer visit the mother did not permit Rodney to return to his father in California. He was then in his mother's custody in Missouri till the hearing on this motion to modify, which was held July 28–29, 1977. During the year he was with his mother, Rodney visited the father in California for four days around New Year's, 1977, and spoke with him a few times on the telephone. The mother denied the father's requests for a July 4 visit, and for a visit during the week before the hearing. He was allowed a supervised visit of two hours in the maternal grandmother's home on the afternoon before the hearing.

At the time of the hearing, the respondent father lived with his wife Linda in Fountain Valley, California. He had been employed by the U.S. Customs Service since at least 1973 and was earning upwards of $20,000 per year. Linda was employed by International Telephone & Telegraph Company. They had been married since December 27, 1975, although they had lived together for about a year prior to the marriage. Rodney had been a member of the household during that year, and knew his father and Linda were not married. He had attended their wedding.

At the beginning of the 31-month period during which Rodney was in his father's actual custody, Mr. Allen was single and living alone. He arranged for responsible adult supervision for Rodney in the late afternoon hours, on school holidays, and also during occasional periods of days or weeks when his employment required him to be away from home. Rodney did poorly in school when he first went to California and was retained in the second grade, but after that got along very well. In December of 1974 Linda came to live with the father, and she assisted in Rodney's care and supervision. The father, and Linda after she entered the picture, gave active aid and encouragement in his schoolwork, in recreation programs and Boy Scouts. During the summer of 1976, before his return to Missouri, he was enrolled in a summer school program in a private school.

In 1974 and 1975, as previously noted, Rodney had spent most of each summer in Independence with his maternal grandparents, Lyle and Roberta Jenkins. The father had visited him there each summer. In 1976 it was August 9 before Rodney came to stay with them, and only after the mother contributed $100 plane fare. (The father had paid all the travel expense for the earlier trips.) The father explained the delay as the result of expense and uncertainty connected with his purchase of a new house in California. At the end of the 1976 summer visit, of course, Rodney did not return to California.

During the California period, the mother would occasionally visit Rodney at the home of her parents during the summers. While he was in California, though, her mail and telephone contacts with him were minimal.

The mother at the time of the hearing had worked for Human Resources Corporation since January, 1976. She had started as a clerk-typist but now was a personnel management and record services specialist, making $7,172 per year. She received $90 per month child support. She and Rodney lived in a modest but well-kept and well-appointed house in a racially mixed neighborhood, where she paid rent of $100 per month. The son of a second marriage, to a Mr. Smead, was in the custody of his father. Before working for Human Resources, she had worked as a barmaid at a lounge, and had worked as a free-lance barmaid and waitress. She had lived with a Mr. Colemen for about one and one-half years before August, 1976, and before that had shared quarters with two other gentlemen. From August, 1976, until January, 1977, however, Scherry lived with her parents and with Rodney. Then when she moved out of her parents' home in January, 1977, Rodney lived with her until the hearing on the motion to modify.

During the 1976–1977 school year, Rodney attended a school about four blocks from his grandparents' home in Independence. The house to which his mother and he moved in January, 1977, was located four or five miles from that school. His mother would take him to school each morning, and he would walk to the grandparents' home after school was dismissed, where his mother picked him up when she got off work. Rodney continued his Boy Scout activities while staying with his grandparents and his mother. He participated in school sponsored recreation, such as rollerskating parties. He and his mother went to the park, ate out, and went to "lots of shows".

Truthfully, Rodney did not flourish in his mother's care after they moved from the grandparents' home. He had missed one day of school before the move. From then till the end of the school year he missed 25 days. His school performance deteriorated. He was frequently ill (his mother: ". . . stomach problems . . . stomach aches . . . real bad headaches . . . throwing up . . . it's mental . . . I guess he makes hisself sick . . ."), and the grandmother would sometimes be called to pick him up at school. He was taken to a physician, and was visiting a psychologist once a week. The syndrome is quite familiar to judges who hear child custody disputes between parents.

Rodney himself was interviewed by the court in chambers, with both attorneys present. He carefully avoided expressing any preference between his parents.

The court's order, besides transferring primary custody of the child to his father and authorizing his removal to California, provided also for two-month summer visits with his mother in Missouri, and for Christmas visits to Missouri in alternate years, with the travel expense to be borne by the father. This will allow the maintenance of a continuing relationship with his mother and his maternal grandparents. The young mother, for whom Rodney expressed a warm filial love, seemed at the time of the trial to be following a more purposeful and ordered life. The grandparents—the grandmother testified at the trial—come through as rather sturdy, sensible people.

It would be hard to improve upon the judgment, and it is affirmed.

All concur.