606 S.W.2d 179 (1980)
N. K. M., Appellant,
v.
L. E. M., Respondent.
No. WD 30789.
Missouri Court of Appeals, Western District.
August 4, 1980.
Motion for Rehearing and/or Transfer Denied October 1, 1980.
Application to Transfer Denied November 12, 1980.
*182 John E. McKay, Kansas City, for appellant.
Sidney L. Willens, Kansas City, for respondent.
Before KENNEDY, P. J., and SWOFFORD and PRITCHARD, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied October 1, 1980.
KENNEDY, Presiding Judge.
At the conclusion of a hearing on the husband's, Leland's, motion to modify an earlier dissolution decree with respect to the custody of a ten-year-old daughter, Julie, the trial court granted the motion and changed the primary custody of the child from the mother, Kathy, to Leland. Kathy's cross-motion to modify the decree in certain respects, and for attorney's fees, was overruled. The mother has appealed. Finding substantial support in the evidence for the judgment, we affirm the same except as to the denial of attorney's fees to Kathy.
The parties were divorced August 25, 1977, after a year's separation. The decree was the result of an agreement between the parties, arrived at after several days of trial. The proposed decree was approved by the court after a hearing at which Kathy gave her understanding consent to its terms. With respect to the custody of the two children of the marriage, the decree gave the custody of son Trent, 15 at the time of the present hearing, to Leland, and custody of daughter Julie, 10, to Kathy, with provisions for visitation. The modified decree gives custody to Leland, but makes fairly liberal provisions for temporary custody in Kathy, upon condition that Julie not be allowed in Betty's presence. Betty will be identified later in the opinion.
Apparently the most bitterly contested contention in the trial, as it was in the modification hearing which we now have *183 under review, was the relationship between Kathy and one Betty. Leland contended in the original dissolution trial, and on the present hearing, that the relationship was unwholesome and had an unhealthy effect upon Julie.
The original decree placing Julie in Kathy's custody contained the following provision: "The court further finds it to be in the best interest of the minor child, Julia Anne_____, and of the parties herein that the award of custody of Julia Anne _____ to Petitioner be conditioned upon Petitioner immediately discontinuing any relationship whatsoever with one Betty _____ and that Petitioner not be in Betty _____'s presence or company at any time for any reason and that Petitioner not have any other female living within the same family residence or group with Petitioner and said minor daughter except a relative or upon order of Court. The Court admonishes Petitioner that a violation of said conditions will constitute a change of circumstances affecting her right to custody of said daughter which will result in a change of custody to Respondent upon Court approval."
We will go aside from our statement of the facts to comment upon this provision in the decree, for Kathy contends that it was an unreasonable condition which the court had no right to place in its decree, was invalid and not binding upon her.
It is, however, within the court's power to make such a provision in its decree. The court has a very wide latitude in formulating a decree which offers the best prospects for serving the welfare of the child. In re Shepler, 372 S.W.2d 87, 90-91 (Mo. Banc 1963); D.J.H. v. J.D.S., 481 S.W.2d 539 (Mo.App.1972); L___ v. N___, 326 S.W.2d 751 (Mo.App.1959). If it seemed to the court that, except for Kathy's association with Betty, Julie's welfare would best be served by staying in her mother's custody, then the court could make the discontinuance of that association a condition of the award of custody. Schuster v. Schuster, 90 Wash.2d 626, 585 P.2d 130 (banc 1978). Suppose the persona non grata were an habitual criminal, or a child abuser, or a sexual pervert, or a known drug pusher? To cut off association with such a person as a condition to the child custody would be entirely reasonable. See In re J.S. & C., 129 N.J.Super. 486, 324 A.2d 90 (1974), where the court imposed conditions upon a visitation by a homosexual father very similar to the conditions imposed in this decree.
The decree's "admonition" to the petitioner that a violation of said conditions "will constitute a change of circumstances affecting her right to custody of said daughter which will result in a change of custody to Respondent upon Court approval" must be regarded as precatory and as surplusage. A provision in the decree that the violation of a condition would automatically result in the transfer of custody from one party to the other would not be given effect by the court upon a later motion to modify, and the court in the present case did not give the original decree that effect. The expectation of the court, expressed in the original decree, that the association would be terminated and that it would not be renewed was one condition, one circumstance that bore upon the child's welfare. Upon the motion to modify the court must determine from all the circumstances and conditions whether Julie's welfare is served by taking her from Kathy's custody and placing her in Leland's custody. The disappointment of the expectation that Kathy would completely disengage herself from the relationship with Betty is a changed condition, whatever may be the weight accorded to it by the court. Having found a violation of the condition, the court must still find from all the circumstances that the welfare of the child is served by the custody transfer. Korn v. Korn, 584 S.W.2d 179 (Mo.App.1979); In re Marriage of Britton, 574 S.W.2d 475 (Mo.App.1978); Lickteig v. Goins, 458 S.W.2d 596, 599 (Mo.App. 1970); § 452.410, RSMo 1978.
There seems to be no argument that there existed before the divorce, and even before the separation of Leland and Kathy a year earlier, a "relationship", as it is termed, between Kathy and Betty. The "relationship" is never quite, but almost, *184 identified in the evidence in the present case as a sexual liaison. They were both nurses-Kathy a registered nurse and Betty a licensed practical nurse. They worked together. They were once seen kissing each other on the mouth. They would withdraw themselves from the company of their co-workers during their lunches and other recesses.
A most telling item of evidence is the transcript of a taped telephone conversation between Kathy and Betty. This occurred before the divorce, and while Kathy and Leland were still living together. It was excluded by the court because antedating the original decree, but it has been preserved in the record. We think it is relevant for the light it sheds on the relationship between Kathy and Betty, and we therefore consider it. Bernard McMenamy, etc., v. Mo. State Highway, 582 S.W.2d 305, 314 (Mo.App.1979); Matter of C___ W___ B___, 578 S.W.2d 610 (Mo.App. 1979); Rule 73.01(3)(c). See also Kallas v. Kallas, 614 P.2d 641 (Utah, 1980).
In the conversation, Kathy tells Betty that she has told Leland "that I would stay here and take care of the kids, wouldn't be gone in the evenings . . ." This is greeted with anger and sarcasm by Betty. "But I didn't want him to touch me," Kathy adds. "Oh, big deal", Betty replies. "That's all I need to hear. Boy, I'm glad he went back to work. I bet you fixed him up just great for the rest of the who knows when."
The conversation continues:
"Betty".
"Yeah?"
"I love you".
"Yeah, sure".
"I love you more than anything in this world".
"Gosh. Neat".
Later Betty says: "Good old Leland's back where he belongs. Creep. Slithers in and slithers out, as usual. Damn that snake."
"But he doesn't have me and he knows it," Kathy says. "He says, `You hate my guts', and I said, `You're right, I do'."
Later Kathy says, "I don't want to have anything to do with him . . . he left because I wouldn't have anything to do with him."
"Well, maybe you'll break over eventually with that, even," Betty responds.
"You're crazier than hell if you think that", answers Kathy.
At the end of the conversation, upon Kathy's urgent plea and Betty's tantalizing, they agree to meet at McDonald's that afternoon at a time when she can get back home before Leland returns home.
This conversation, confirmed by other testimony in the record, shows Kathy to be quite passive and servient in her relation to Betty, while Betty occupies a dominant role.
The most prominent question in the hearing on the motion to modify was whether the relationship between Kathy and Betty had continued after the dissolution decree. There was evidence in the modification hearing from which the court could have found that Kathy began, almost at once, to have second thoughts about her acceptance of the terms of the decree, and that her association with Betty did continue. Some Filipino nurses who were employed at the Kansas City College for Osteopathic Medicine-where both Betty and Kathy were also employed (Kathy from November 21, 1977, and Betty from February or March, 1978)-were frequently in the company of Betty, Kathy and Julie on shopping trips, visits to the Icecapades, ball games, shows, picnics and to Worlds of Fun, and other outings. On a Mother's Day visit to Worlds of Fun, Kathy was admitted free and Betty paid her own and Julie's admission. On a hayride, Betty paid both Kathy's and Julie's admission. On these occasions Kathy's car was the usual mode of conveyance, and Betty would normally do the driving.
The testimony of the Filipino nurses about the times Betty, Kathy and Julie were together range over almost the entire period since the divorce decree to a time shortly before the modification hearing.
*185 There was evidence from which the court could find that Betty had a direct and baleful influence upon Julie. A Filipino nurse testified to a letter from Julie to Betty: "Betty showed me a letter from Julie sent to her while she was in Colorado and it talked about missing Betty and how she yearned for her and how she would wish Betty . . . would call her up and talk to her on the phone because she loved talking to her on the phone. It was the kind of a letter that would not come from a nine-year-old, it was more passionate, I would say." To the same witness Betty once said, "If Julie is going to turn out to be a homosexual, that is her life, it's up to her".
During the court's in-camera conference with Julie, Julie expressed her dislike for her father and gave as her principal reason, "He won't let me see my friend. He won't let me see my friend, Betty." Betty had "taken us out for Cokes and taken us places where we have never been to before. She took us to Silver Dollar City . . . We have been to movies and quite a few places." She at first said she had seen Betty only once since the divorce, "when her grandfather died", then added that she had seen her when she "came over to pick up her stuff". Confronted with the social outings with the Filipino nurses, Julie replied, "Yes, but she (Betty) never talked to me". Several of the incidents testified to by the Filipino nurses were denied by Julie.
A police officer testified to arresting Betty on May 21, 1977, after she had wrecked her car. She was intoxicated. She used the most scurrilous and shocking language toward the police officer, kicked, bit and spit upon him, and threatened to kill him. Her language-which she used also in the hearing of Julie when Julie was in the company, according to other testimony went well beyond polite cusswords but referred to private biological functions and to incest.
Police records were offered which showed Betty's convictions for simple assault and for disorderly conduct, as well as numerous traffic violations, and two license revocations. These were excluded by the court, but we consider them under Rule 73.01(3)(c). Menos v. Hodges, 499 S.W.2d 427 (Mo.1973); Brewer v. Blanton, 555 S.W.2d 381, 385 (Mo.App.1977).
A second change of circumstances alleged in Leland's motion to modify was the frustration of his visitation rights. According to the original decree, he was to have Julie in his custody each sixth weekend. The intervals between visitation weekends were because of Kathy's plan to move to Maryville, a distance from Kansas City. It was her purpose at the time of the divorce to get employment in that area. This plan, however, never materialized. She never attempted to get a job in the Maryville area. Leland, whose testimony was corroborated in some respects by Trenton, testified to repeated disappointments in his efforts to exercise his visitation rights.
Leland had continued to live in the residence which had been the family residence. He testified to his employment as a sheet metal craftsman. He had been employed at his present employment for five years. He testified to the arrangements he would make for Julie's care during his absence from home at his employment. His take-home pay was $318 per week. He had been paying Kathy $150 per month child support for Julie.
Kathy's evidence, since it tends not to support the judgment of the court, may be summarized. Both Kathy and Betty denied any homosexual affair. Kathy said she had seen Betty about two dozen times from August 25, 1977, the date of the original decree, down to the date of the modification hearing. These occasions were primarily with other nurses and not alone. Dr. Barbara Buchanan, a psychiatrist, testified that Julie was a well-adjusted child and recommended that Julie be left with her mother. She gave as her reasons for the recommendation the stability of the child in one home environment, one neighborhood and one school setting; the child's preference; her outstanding scholastic performance and normal relationships with boy friends both in the neighborhood and in school; the child's distrust of her father; and Kathy's *186 good parenting skills. Dr. Buchanan also noted that Julie was reaching puberty and needed a mother figure.
Kathy excused the breakdown in the visitation schedule on the grounds of Julie's resistance thereto, and testified to her own efforts to get Leland to accept daytime visitation and a gradual regaining by Leland of Julie's confidence.
There were no findings of fact nor conclusions of law requested and none made. We do not know precisely the trial court's view of the evidence, but all facts are deemed found in accordance with the result reached. Halbrook v. Halbrook, 557 S.W.2d 45 (Mo.App.1977); Smith v. Smith, 552 S.W.2d 321 (Mo.App.1977). In these cases, we search for evidence and inferences which from any perspective support the court's decision. Roth v. Roth, 571 S.W.2d 659 (Mo.App.1978).
The trial court's view of the evidence could very well have been that Betty's influence upon Julie did not serve her welfare in the best interests. That, of course, is the over-arching principle by which courts are to be guided in child custody cases. In re Shepler, supra.
There emerges from the evidence a picture of Betty as a powerful, a dominant personality. She had befriended Julie and had won her affection and her loyalty. She had broached the idea of homosexuality to the child.[1] Allowing that homosexuality is a permissible life style-an "alternate life style", as it is termed these days-if voluntarily chosen, yet who would place a child in a milieu where she may be inclined toward it? She may thereby be condemned, in one degree or another, to sexual disorientation, to social ostracism, contempt and unhappiness. Appellant Kathy stresses Dr. Buchanan's testimony that the child at this time-age 10-shows no ill effects from her present environment. Dr. Buchanan finds the child to be normal and well adjusted. The court does not need to wait, though, till the damage is done. If the child's situation is such that damage is likely to occur as her sexual awareness develops with the approach of young womanhood, the court may in a proper case remove her from the unwholesome environment. Mansell v. Mansell, 583 S.W.2d 284 (Mo.App.1979).
Furthermore, Betty's hatred for Leland is clear. There is a strong suggestion in the evidence that she is a competitor with Leland for the child's affections, and that she is having some success in alienating her affections from him.
Granted, as appellant Kathy reminds us,
"The parental rights of a homosexual, like those of a heterosexual, are constitutionally protected. Fundamental rights of parents may not be denied, limited or restricted on the basis of sexual orientation, per se. The right of a parent, including a homosexual parent, to the companionship and care of his or her child, insofar as it is for the best interests of the child, is a fundamental right protected by the First, Ninth and Fourteenth Amendments to the United States Constitution."
In re J.S. & C., supra, 324 A.2d at 92. The same case says, however:
"Although parents possess various rights such as custody and visitation these rights will fall in the face of evidence that their exercise will result in emotional or physical harm to a child or will be detrimental to the child's welfare." Id., 324 A.2d at 95.
*187 The case allows visitation by children to a homosexual father but restricts the visitation to daytime and imposes several conditions including "not be in the presence of his (male) lover".
Appellant advances several evidentiary points as grounds for reversal.
It should first be said that the admission of improper evidence, or the failure to observe procedural rules of evidence, in a court-tried case is scarcely ever held to be reversible error. In re S' Adoption, 581 S.W.2d 113 (Mo.App.1979); Broyles v. Broyles, 555 S.W.2d 696 (Mo.App.1977). The reason is that the court can presumably sort out the incompetent and the irrelevant and base his decision upon the competent and the relevant. Haley v. Horwitz, 290 S.W.2d 414, 418 (Mo.App.1956); McCormick, Evidence § 60 (1972). Particularly in child custody cases is the evidence permitted to take a wide range, for the judge's ear is alert to the overtones in the evidence, and his eye to the coronas. L.H.Y. v. J.M.Y., 535 S.W.2d 304 (Mo.App.1976); L-E-(S-) v. J-A-E-, 507 S.W.2d 681 (Mo.App.1974). An overly punctilious adherence to the technical rules of evidence may miss many of the subtleties and nuances. This does not mean that the fundamental rules of evidence may by any means be ignored in any judicial proceeding, but that the reviewing court will only in rare cases find cause for reversal in the admission of improper evidence, or in rulings on such formal matters as the form of a question or an answer-so long, always, as substantial competent evidence remains to support the judgment. Smead v. Allen, 581 S.W.2d 93 (Mo.App. 1979); In re Adoption of K, 417 S.W.2d 702, 708 (Mo.App.1967).
Appellant makes the point that several items of evidence were hearsay and should have been excluded upon objection. Their admission, she argues, requires reversal.
One such item was the testimony of Fatima, a Filipino nurse, about the letter from Julie to Betty, which we have mentioned. The witness had seen the letter; its identification was not challenged. The only objection was that it was hearsay. But the fact that Julie wrote the letter, the fact of the letter itself, revealed Julie's feelings toward Betty and makes it relevant on that issue. It was not offered to prove some fact stated in the letter. State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W.2d 360, 361 (banc 1947). It is unlike appellant's case of In re Marriage of Cavitt, 564 S.W.2d 53 (Mo.App.1978), where the court allowed a witness to testify to the contents of an investigative report made by a social agency in a distant state.
Another item, objected to as hearsay, was a conversation between Betty and Julie, reported by Betty to Fatima and testified to by her. Once again, the fact of the statement of Betty to the witness was revelatory of Betty's feelings toward Julie, and therefore relevant for that limited issue. If it was admissible for any purpose, it was admissible. We may not assume that the court received it for the improper purpose of proof of the truth of the facts stated by Betty to the witness. Haley v. Horwitz, supra.
Judge Martin testified to the testimony of witnesses in the earlier, the original divorce trial. Some of this was plainly inadmissible as hearsay. 5 Wigmore on Evidence, § 1666 (1974). It was harmless, however, in that there remained substantial evidence to support the judgment. Smead v. Allen, supra; In re Adoption of K, supra.
Objection was made, on the ground of hearsay, to two memos in the personnel files of Truman Medical Center and Independence Sanitarium, relating to the respective hospitals. These were business records and, as against the hearsay objection, were admissible under § 490.680, RSMo 1978. Even if they had been improperly admitted, their admission would have furnished no ground for reversal. There would have remained sufficient substantial evidence to support the judgment, and the erroneous admission of evidence would have been harmless. Smead v. Allen, supra; Adoption of K, supra.
Appellant's next evidentiary point is that the court denied a motion to allow *188 proof only of those instances of Betty's and Kathy's being together to which Kathy herself had testified. The reason for the motion was that the respondent, Leland, in answer to appellant Kathy's interrogatories, had stated that they had been seen together at "various times" or "various unspecified times" at certain places, and in answer to a follow-up interrogatory asking for dates and hours, had answered that he could not be any more specific.
There had been no motion for sanctions.
The failure of respondent to specify dates and hours in his answers to interrogatories certainly did not require the court to exclude evidence of instances when Betty and Kathy were seen together.
The appellant cites us to no case supporting her position on this point. The most that can be said for the appellant's motion is that it was addressed to the court's discretion and that we see no abuse of discretion in denying the motion. Doyle v. Doyle, 577 S.W.2d 64, 67 (Mo.App.1978); In re Marriage of Dickey, 553 S.W.2d 538, 541 (Mo.App.1977).
Appellant complains of the testimony of Dr. Roosa, a clinical psychologist called by respondent. Appellant's basis for complaint is that Dr. Roosa had "no personal knowledge of this case and no proper hypothetical question from which to respond". We do not need to deal with this objection, since Dr. Roosa's testimony did not aid respondent nor damage appellant. Its admission, if error, was not prejudicial.
At one point, the judge excluded upon objection a certain police report relating to the arrest of Betty upon a drunken driving charge. The court said: "I'll not allow it in evidence, it is the same thing that Mr. Willens read to Dr. Buchanan in his hypothetical question, so it is part of the evidence."
On the basis of this statement by the court the appellant asserts prejudicial error "because (the lower court) assumed that assertions in respondent's hypothetical questions were evidence even though objected to in the hypothetical and not in evidence elsewhere". The appellant made no objection to the court's remark, asked for no correction or retraction, and complains of no ruling by the court. We assume the court and both attorneys knew that the hypothesization of a fact did not constitute evidence of the fact. The remark of the court is no ground for reversal.
Appellant then complains because the court "routinely allowed answers to improper compound questions" and "routinely allowed improper narrative and leading questions". Appellant claims the cumulative effect of the allowance of the improperly phrased questions resulted in prejudicial error.
We have examined the examples which appellant has pointed out in her brief. The allowance of compound questions, narrative questions and answers, and leading questions are the kinds of matters which must be left with the discretion of the trial court and we find no abuse of the court's discretion in his rulings in these matters.
A final point must be taken up. The court did not allow Kathy any attorney's fees. Kathy makes $302.36 take-home pay each two weeks. She has no assets, but debts totaling $9,086, including $3,662 attorney's fees and expenses for the present modification proceeding. Her attorney, Mr. McKay, had spent 72.5 hours through the hearing at an hourly fee of $45.00. The hearing continued over parts of seven days. There is a transcript of 531 pages, and he has filed a thorough brief and reply brief totaling 81 pages.
Leland makes approximately $2,000 per month. He owns the family residence valued at $50,000, on which there is a $22,500 mortgage upon which he pays $250 per month. He pays $114 a month on an automobile loan upon his 1978 Cutlass automobile. He has about $1,300 cash in checking and savings accounts. His attorney's fees through the trial court hearing were $3,200, and had been paid. Both Kathy and Leland had paid and incurred attorney's fees in extraordinary amounts before the present proceeding.
We do not agree with Leland that Kathy's defense of the motion to modify was in bad faith or wholly without support. *189 While the trial court has a broad latitude in fixing attorney's fees, Kieffer v. Kieffer, 590 S.W.2d 915 (Mo. banc 1979), we believe Leland should contribute $2,500 to Kathy's attorney's fees and litigation expenses. Rouggly v. Whitman, 592 S.W.2d 516, 519 (Mo.App.1979); Brueggemann v. Brueggemann, 551 S.W.2d 853, 859 (Mo.App. 1977); LoPiccolo v. LoPiccolo, 547 S.W.2d 501, 506 (Mo.App.1977); In re Marriage of Zigler, 529 S.W.2d 909, 910 (Mo.App.1975); Roberts v. Roberts, 450 S.W.2d 469, 474 (Mo.App.1970); Harriman v. Harriman, 281 S.W.2d 566, 571-2 (Mo.App.1955); Crooks v. Crooks, 197 S.W.2d 686, 688-9 (Mo.App. 1946).
The judgment of the trial court is affirmed, except that part which denies Kathy an award of attorney's fees and litigation expenses. As to that part of the court's judgment, it is reversed and the case is remanded for the entry of a new judgment awarding to Kathy attorney's fees and litigation expenses of $2,500. He may pay it in monthly installments of $100, without interest except upon delinquent amounts. The court costs are to be borne equally by the parties.
All concur.
NOTES
[1] The testimony was as follows: "In one of our conversations Betty _____ told me she had a chance to take Julie out for a ride in her old Chevy and she was trying to ask Julie how she feels about her, how she feels about her father, and she asked Julie if she knows why her father is doing this and would she still regard Betty _____ . . . Betty was asking Julie if she would still feel the same even if there were allegations that she was the kind of person who would be harmful to be with, not good for her, and she said she went about it in a roundabout way, trying to tell Julie that there were allegations about her being a homosexual and Julie said, according to Betty, that, `I would still love you even if you were' . . . She made comments about Julie being mature for her age and she was perceptive . . . She (Betty) was moved . . . She said, `If Julie is going to turn out to be a homosexual, that is her life, it's up to her'."