In re the Marriage of Reba M.
ELLIS, Appellant,

v.

Randy S. ELLIS, Respondent.

No. WD 39456.

Missouri Court of Appeals,
Western District.

March 15, 1988.

Sheldon Bernstein, Kansas City, for appellant.

Ronald R. Holliday, Savannah, for respondent.

Before KENNEDY, C.J., and NUGENT and BERREY, JJ.

BERREY, Judge.

Appeal from an order modifying a dissolution decree transferring custody of a minor child, Trinity Ellis, from her mother, appellant Reba Ellis, to her father, respondent Randy Ellis. Appellant alleges that the trial court erred in removing the minor child Trinity Ellis from appellant's custody because: (1) the removal was not in the best interests of the child; (2) substantial evidence established that the father was not a fit custodian; (3) the modified custody decree was a punitive measure taken against appellant; and (4) the court relied on evidence violating § 452.410, RSMo 1986. Appellant also argues that the trial court erred by ordering her to pay the fees of the guardian-ad-litem and court appointed psychologist as this would constitute an unlawful award of child support to a third party. Finally, that the evidence established her inability to pay these fees making it impossible to comply with the order of the court.

Randy and Reba Ellis were married on December 18, 1982, following a brief courtship. This was the second marriage for both parties. Reba had one child, Jeremy, from her marriage to her first husband, Gary Ledford. One child resulted from the union of Randy and Reba Ellis, Trinity Marie, born on October 3, 1983. The marriage lasted but a short time. The parties separated in October of 1984, and they were subsequently divorced on September 26, 1985. Custody of Trinity was awarded to Reba with visitation on alternating Saturdays given to Randy, full weekend visitation to begin after Trinity's fourth birthday. Randy was obligated to pay the sum of twenty-five dollars per week child support. Efforts on Reba's part to reconcile were to no avail. Randy remarried and subsequently became the father of twins.

Randy exercised his visitation rights with Trinity and, on occasion, Jeremy was also

allowed to visit. This came to an abrupt halt when Reba filed motions in July 1986, to suspend Randy's visitations with Trinity. Reba alleged that Trinity was "emotionally upset" after her visitations and asked the court to abate the visitations pending investigation of possible physical and/or sexual abuse. Reba had Trinity examined by a child psychologist at Menninger Foundation, Dr. Susan Voorhes. The sessions with Dr. Voorhes were taped and introduced into evidence at the eventual trial. Reba filed her motion pending the outcome of Dr. Voorhes' report. Most of her allegations on tape were eventually discredited at trial.

In the interview Reba makes several strong accusations regarding Randy. She warned of Randy's alleged sexual abuse of Trinity in an incident involving Jeremy, her son by her first marriage to Gary Ledford. Reba described the incident as follows:

MRS. ELLIS: "And he's kind of like a mind of an eight—You know, he's just not grown up yet. He's, you know, and he was in the—What got started, he was taking a bath one night. He was just yelling, 'Mom, why don't you come in here and get Trinity.'"

DR. VOORHES: "Uh-huh."

MRS. ELLIS: "And I said, 'Okay.' And so I went in to get her, and he says, 'Mom, she's grabbing at me.' And I said, 'What now?'" He said, 'She's grabbing.' And I said, 'Oh, Jeremy. She doesn't do that.'"

DR. VOORHES: "Uh-huh."

MRS. ELLIS: "And he says, 'Yes, she is.'"

DR. VOORHES: "Uh-huh."

MRS. ELLIS: "And so she was—She said, 'Jeremy, that's your penis.'"

DR. VOORHES: "Uh-huh."

MRS. ELLIS: "Well, and Jeremy, well —And Jeremy was just shocked. He says, 'Mom, she told me what it was.' And he gets real embarrassed."

DR. VOORHES: "Uh-huh."

MRS. ELLIS: "So, he was real embarrased. And, you know, she says, 'Jeremy, let me play with you. Daddy does. Daddy lets me.' You know. And then I

was trying to talk to her, 'No, little girls—Good girls don't do that. We don't do things like that around here.'"

DR. VOORHES: "Uh-huh."

MRS. ELLIS: "And she kept saying—I said, so—And she kept saying yes, you know, yes. She kept arguing with me."

DR. VOORHES: "Uh-huh."

MRS. ELLIS: "And she goes, 'Daddy puts it right here.' And she was showing me, and she goes, 'Daddy puts it back here, too.'"

In her testimony at trial Reba alleges that the bathtub incident occurred in June of 1986, but in late June during the taped interviews she told Dr. Voorhes that the incident occurred two months before. In the middle of July she told Detective Mike Strong that the incident happened about one month before. The trial judge found that these discrepancies were too great to be the product of a faulty memory given the significance of the occurrence that was the subject of the accusations.

Reba told Dr. Voorhes during the taped interview that she had twice taken Trinity to Dr. Joseph Prokop to be examined and that Dr. Prokop told her that someone was definitely playing with and fondling Trinity. She stated that he would go to court for her if necessary. She even made the statement that Dr. Prokop seemed to think that the abuser might be Randy's younger brother. At trial Dr. Prokop testified for Randy Ellis. He had no recollection of ever being told that Trinity had been sexually abused and his files indicated that the office visits of Trinity were for complaints such as colds and earaches. His practice was to report any sexual or physical abuse to the hotline. This was not done in the instant case. His records showed no evidence of molestation.

Reba also made remarks during her interview with Dr. Voorhes accusing Randy of frequently beating her and raping her while she was pregnant. One incident where Jeremy was allegedly burned by Randy with a lighted cigarette she described in detail. She alleged that Randy burned Jeremy's arm. She never called the police during this time nor did anyone wit-

ness any burn marks on Jeremy's arms or note any change in the relationship between Jeremy and Randy. Again, the trial judge found the discrepancies between different versions of the story make it unworthy of belief.

Several other curious statements were captured on the tape. Reba never called the child abuse hotline or reported her suspicions to the authorities. Instead she went to her attorney and then to Dr. Voorhes whom she told, "if you find that she has been abused, you know, then we're going to file tomorrow." Reba never attempted to stop Randy's visitations even after she said she suspected abuse until after this interview.

Reba also told the doctor that Randy fought giving her child support and that she really didn't want it because if he didn't have to pay he would "maybe give her up or quit coming to see her." Her allegation was not supported by the record. Her feelings about visitation by an ex-husband becomes crystal clear when examining her dealings with Jeremy's father, Gary Ledford. Jeremy had not seen his father since he was very young. Gary got discouraged with Reba's attempts to make visitation with Jeremy as rough as possible. Reba quite candidly admitted, "I lucked out there." By her actions it is clear what Reba's attitudes are toward visitation.

In response to Reba's motions, Randy asked the court for a change of custody based on alienation of affection including making false allegations of child and/or sexual abuse. The matter was set for trial in December 1986. In the interim supervised visitation was set up for Randy. Prior to trial a settlement was offered to and accepted by Randy, giving him expanded unsupervised visitation and dropping the allegations made against him.

This peaceful solution did not resolve the conflict; it was merely the calm before the storm. During one of her visitations with Randy, Trinity slipped and fell. Reba claimed Trinity had come home after the visitation crying and upset, saying that Randy had hurt her and that her bottom hurt. An examination by Dr. Leo Spittler revealed an abrasion on Trinity's labia. Dr. Spittler thought it unlikely that the abrasion was caused by natural means. Testimony by the nurse present at the examination, Ann Verbeck, is illuminating. She testified that the abrasion was not consistent with a grown man putting his penis in the vaginal area. Such an abrasion could be caused by many things. Once again Reba filed a motion to abate visitation after having Trinity examined.

In response to Reba's motion, Randy filed a motion asking for a change in custody. This time no settlement was reached and the matter proceeded to trial.

Trial took place on April 1, 2, and 3, 1987. After a three day trial producing voluminous testimony, the court, on April 20, 1987, entered its ruling changing the custody of Trinity from Reba to Randy. In addition, Reba was ordered to pay court costs, expert fees and guardian-ad-litem fees. This appeal followed.

Appellant first contends that the trial judge erred in transferring custody of Trinity to Randy because this change of custody was not in the best interests of the child. Appellant labels the judge's action as punitive and argues that the weight of the evidence established that it was in Trinity's best interest to remain in her custody. She also argues that substantial evidence established that Randy was an unfit custodian for Trinity.

It is axiomatic that when a determination of custody is to be made the ultimate test is that of what is in the best interests of the child. *Bashore v. Bashore,* 685 S.W.2d 579 (Mo.App.1985); § 452.375, RSMo 1986. Upon review of the actions of the trial court it is presumed that the court examined the evidence thoroughly and ordered what it believed to be in the best interests of the child. *McDowell v. McDowell,* 670 S.W.2d 518 (Mo.App.1984). No findings of facts or conclusions of law were made in this case, thus all facts are deemed found in accordance with the result reached. *N.K.M. v. L.E.M.,* 606 S.W.2d 179, 186 (Mo.App.1980). Reversal of the trial court's award of custody can only be justified on the grounds that there is no

substantial evidence to support it, it is against the weight of the evidence, or it erroneously declared or applied the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Upon review of the record it is clear that no grounds exist to reverse the award of custody made to Randy Ellis. Appellant makes much of the duty of a parent to take action if they suspect that their child is being abused. Indeed, a child is owed a duty of protection and of having abuse reported. *In Interest of A.M.K.,* 723 S.W.2d 50, 53 (Mo.App.1986). It is clear from the record however, that Reba did not seek modification of visitation in an effort to protect her daughter but rather used the device of making a false accusation of sexual abuse against Randy as a weapon to cut off his access to Trinity. Despite her protestations to the contrary and her characterization of Randy as an unfit custodian who had definitely abused Trinity, appellant is shown as a woman who has programmed her daughter in an attempt to back up her allegations against the child's father in order to interfere with his rights of visitation.

Appellant relies heavily on statements by Dr. Voorhes and by Dr. Watkins, the court appointed expert. Appellant overstates their involvement in the case. Neither witness through their limited contacts with the case was in full possession of the facts as was the trial judge. The trial judge is in a superior position to determine and evaluate the credibility, sincerity and character of all the witnesses. *McDowell v. McDowell, supra.* Review of the record reveals sufficient evidence to support the conclusion that Reba repeatedly lied about Randy's abuse of Trinity. Investigation by Detective Mike Strong of the complaint against Randy led him to the opinion that either the situation was misinterpreted or did not happen at all. Dr. Watkins himself testified as to the possibility that Trinity had been coached. Other evidence adduced showed a good, healthy relationship between Trinity and Randy inconsistent with the depiction of Randy as an abuser.

■ Modification of custody requires not only the best interests of the child be considered but also that a change in circumstances be shown. The non-custodial parent has the burden of meeting these requirements. *Knoblauch v. Jones,* 613 S.W. 2d 161 (Mo.App.1981); § 452.410, RSMo 1986. Randy Ellis has met this burden. Appellant points to the bond among herself, Jeremy and Trinity as testified to by Dr. Watkins and Carol Cornelius of the Department of Family Services. She also speaks of the possible trauma to Trinity if removed from her care. However, the evidence clearly supports the trial court's determination that Trinity's best interests are served by change in custody.

■ Reba repeatedly interfered with the father-daughter relationship between Randy and Trinity. Interference by one parent with decretal rights of visitation is a changed condition which may justify a modification in custody. *O'Loughlin v. O'Loughlin,* 712 S.W.2d 450 (Mo.App. 1986). An award of custody should not be used as either a reward or punishment. *M.D.R. v. P.K.R.,* 716 S.W.2d 866, 868 (Mo. App.1986); *Bashore v. Bashore, supra,* 685 S.W.2d at 581 (Mo.App.1985). By interfering with Randy's visitation, Reba is attempting to deprive Trinity of the opportunity to know and love her father. This is not in Trinity's best interest. Ideally, a child should have a well founded relationship with both parents. *In re Marriage of Powers,* 527 S.W.2d 949 (Mo.App.1975).

■ Trinity needs the chance to know and love both of her parents. Reba is unwilling to allow this to happen. Alienation of a child's affection and interference with visitation are grounds for a major custody change although such a result is not automatically compelled. *Slinkard v. Slinkard,* 589 S.W.2d 635, 636 (Mo.App. 1979). The welfare of the child remains as the supreme consideration. *Id.* Reba repeatedly made false accusations against Randy and programmed Trinity in an effort to manufacture evidence against him. The trial judge found that Randy would, "provide Trinity with the opportunity to know and love her mother in spite of everything that has taken place, because that's what's in Trinity's best interests." Clearly then,

this was not a punitive measure designed as punishment for Reba but a decision based, quite properly, on what is best for the child.

Appellant claims that the trial court erred by allowing evidence which violated the standards of § 452.410, RSMo 1986 which states:

> The court shall not modify a prior custody decree unless ... it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.

Specifically, the appellant objects to evidence from before the order of December 9, 1986, and the subsequent amended order nunc pro tunc. Evidence was also introduced from prior to the dissolution of the parties in September 1985. Testimony concerning settlement negotiations involved in the December 9, 1986, order was also admitted.

■ At the outset it must be noted that in a bench tried case the judge is allowed a great deal of latitude in reception of evidence. *McCammon v. McCammon*, 680 S.W.2d 196, 202 (Mo.App.1984). A trial judge presumably can weed out the incompetent and irrelevant evidence from that which is allowable, and render his decision based upon his consideration of proper evidence. *Id.* It is rare for the admission of improper evidence to be held reversible error. *N.K.M. v. L.E.M., supra,* 606 S.W.2d at 187. This is especially true in child custody cases where the evidence is allowed to, "take a wide range, for the judge's ear is alert to the overtones in the evidence, and his eye to the coronas." *Id.* Absent a clear showing that the trial court manifestly abused its discretion, its decision will not be overturned. *P.A.(D.)K. v. T.R.D.,* 662 S.W.2d 583, 586 (Mo.App.1983). No such abuse is present in the instant case. An appellant must demonstrate an absence of substantial, competent evidence supporting the judgment in order to reverse it. *Id.* Here, although evidence pri-

or to the dissolution of the marriage was before the court, there was no lack of evidence of appellant's conduct after the dissolution to warrant the change in custody and thus no prejudice to appellant can be demonstrated.

■ The court also allowed evidence from before and concerning the settlement of December 9, 1986, to be introduced. Appellant's pattern of persistently making false claims of sexual abuse in order to limit Randy's contact with Trinity was not apparent at that time. Her subsequent actions show her determination to persist in her interference with the relationship between father and daughter. The general rule is that settlement offers and the negotiations concerning them are inadmissible because the law favors the settlement of disputes. *J.A. Tobin Const. v. State Hwy. Com'n.,* 697 S.W.2d 183 (Mo.App.1985); *McCammon v. McCammon, supra,* 680 S.W.2d at 202. There are narrowly defined exceptions to this rule. Missouri Evidence Restated Section 408 lays out the black letter statement of the law in Missouri:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

As noted, one of these exceptions pertains to proving the bias or prejudice of a witness. Under the agreement of December 9, 1986, both parties agreed to withdraw the pending motions and Randy received expanded, unsupervised visitation. Appellant testified:

Q. Right. Now, in regard to the allegations you initially made against Randy in July of '86, that case was set for trial on December 1st of 1986; wasn't it?

A. In December, yes.

Q. And apparently, prior to the trial of those allegations, you apparently came to the conclusion that Randy hadn't done anything to Trinity; had you come to that conclusion?

A. No, I didn't.

Q. Well, didn't you, through your attorney, offer to withdraw all of your motions if Randy would withdraw his motion for a change of custody?

A. They told us just wait till further evidence.

An objection was made at this point which the court overruled, allowing limited inquiry of appellant because of the grave nature of the proceedings. When Randy refused to settle the case Reba agreed to more generous visitation, a course of conduct hardly consistent with the picture of a parent deeply concerned with the sexual abuse of her daughter. Her prejudice against Randy is apparent in her attempt to use the settlement as a device to buy time to gather enough evidence to rid herself of his continued presence in Trinity's life.

Appellant next argues that the trial court erred by ordering her to pay the fees of the court appointed psychologist and the guardian-ad-litem. She characterizes these payments as an unlawful award of child support to a third party. Further, she argues that the evidence establishes the impossibility of complying with the order because of her inability to pay these fees.

■ The trial judge ordered Reba to pay $2,500 to the guardian-ad-litem and $1,920 to the court appointed psychologist. These awards were made, "in lieu of child support." Obviously, these awards are not child support, nor were they intended as such. They are court costs and were, quite properly, taxed to Reba Ellis. Authority for this action is found in § 452.490.4, RSMo 1986, where it states, "[t]he court shall allow a reasonable fee to the guardian ad litem to be taxed as costs in the proceeding."

Allocation of costs between the parties is governed by § 452.355, RSMo 1986, which states:

The court from time to time after considering all relevant factors including the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under sections 452.300 to 452.415 and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

One element that the court is directed to consider is the financial resources of the parties. This is not, however, the only factor under consideration. This statute was discussed in *Kieffer v. Kieffer*, 590 S.W.2d 915, 919 (Mo. banc 1979), where the court made it clear that how the factors balance varies from case to case so that, "[o]nly when the trial court is shown to have abused the broad discretion with which it is vested in this regard should its award (or orders) be overturned."

Reba receives $279 a month from ADC. In addition she receives $43 to $50 a month in child support and $183 in food stamps. Her trailer payments are $200.04 a month but her parents make these payments. Randy makes $6.50 an hour at his job or about $200 net per week. He pays $50 a month on the home he rents from his father. He has approximately $1,000 in savings. Both Randy and Reba are responsible for their own attorney's fees. Neither party is wealthy. Reba has her son Jeremy to care for. Randy is responsible for his wife, his new twins and for Trinity. Under the circumstances it was not an abuse for the trial court to apportion costs the way it did. The judgment is affirmed.

All concur.