Teddy D. STUART, Respondent,

v.

DIRECTOR OF REVENUE, State of Missouri, Appellant.

No. 15349.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 28, 1988.

William L. Webster, Atty. Gen., Jatha B. Sadowski, Sp. Asst. Atty. Gen., Jefferson City, for appellant.

No appearance for respondent.

HOLSTEIN, Chief Judge.

The Director of Revenue of the State of Missouri (Director) appeals a judgment of the Circuit Court of Phelps County entered in an action filed by Teddy D. Stuart seeking de novo review of an administrative suspension of Stuart's driving privileges. §§ 302.500–540.[1]

The only point on appeal is that the court erroneously found that the Director had failed to meet his burden of proving that Stuart operated a motor vehicle on February 8, 1987, with a blood alcohol level equal to or greater than thirteen-hundredths of one percent by weight. Stuart has not filed any brief on appeal.

In determining whether the Director has met his burden of proof, our standard of review is that followed in other court-tried cases. *See Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Bradford v. Director of Revenue*, 735 S.W.2d 208, 209 (Mo.App.1987). If the parties do not request findings of fact and the court makes no finding on a specific issue, we assume that such determination of fact was made consistent with the judgment entered by the trial court. *Scott v. Director of Revenue*, 755 S.W.2d 751, 752 (Mo.App.1988). In reviewing the evidence in a court-tried case, we disregard incompetent evidence and consider admissible evidence which

---

1. Unless otherwise indicated, all references to statutes are to RSMo 1986.

was rejected by the trial court. *Menos v. Hodges*, 499 S.W.2d 427, 429 (Mo.1973); *Smead v. Allen*, 581 S.W.2d 93, 94 (Mo. App.1979); Rule 73.01(c)(3).

The factual questions for determination in this proceeding for de novo review of an administrative suspension or revocation of a driver's license are (1) whether Stuart was driving, (2) whether Stuart was arrested upon probable cause that he committed an alcohol-related traffic offense, and (3) whether, at the time Stuart was driving, he had an alcohol concentration in his blood or breath of thirteen-hundredths of one percent or more by weight. §§ 302.505(1) and 302.530(4).

■ On February 8, 1987, at 1:36 a.m., officer David Pikka of the Rolla Police Department was on duty and operating his patrol vehicle on Highway 63 in the city of Rolla. Pikka observed a 1975 Ford van sitting in a left-turn lane ahead of him. He pulled in behind the van. The van sat for an "abnormal amount of time since there was no traffic," and then turned left. Pikka followed the van some distance to the east on Kingshighway. The van then turned right making a wide turn crossing into the oncoming lane of traffic. The van proceeded some distance to another intersection where it again stopped. Although there was no traffic, the van remained stopped. Pikka, still behind the van, waited for it to move. When it did not move after a period of time, he sounded his horn. After crossing the intersection, Pikka directed the van to stop.

The only occupant of the van was Stuart. Pikka exited his vehicle, approached Stuart, and noticed the smell of intoxicants and that Stuart's speech was slurred. Pikka asked Stuart to perform three field sobriety tests. Stuart was unable to say the alphabet, was unable to touch either index finger to his nose, and staggered when asked to walk heel to toe. Pikka was of the opinion that Stuart was intoxicated. He arrested Stuart, took him to the police station, and observed him at all times from the time he was arrested until Stuart blew into the machine used to analyze breath for presence of alcohol.

■ The foregoing evidence was uncontradicted and clearly demonstrates that Stuart was driving the vehicle and that probable cause existed for his arrest for an alcohol-related traffic offense. If a police officer observes a traffic violation or unusual operation of a motor vehicle, and upon stopping the motorist there are specific indications of alcohol consumption noted, sufficient probable cause to make an arrest for an alcohol-related traffic violation exists. *Aron v. Director of Revenue*, 737 S.W.2d 718, 719 (Mo. banc 1987). The first two factual issues were established in favor of the Director. The only remaining factual question is whether Stuart's blood alcohol concentration was thirteen-hundredths of one percent or greater by weight.

Police Officer Cody Fulkerson of the Rolla Police Department testified that he administered the breathalyzer test to Stuart at 2:04 a.m. on February 8, 1987. Fulkerson is the holder of a Type III permit authorizing him to operate a machine identified as a "BAC Verifier." *See* 13 Mo.Admin.Code 50–140.040(5). According to Fulkerson, he went through each of the required steps in using the BAC Verifier. 13 Mo.Admin.Code 50–140.060(13). Fulkerson found the machine to be functioning in a normal manner. The breath test conducted on Stuart resulted in a machine printout reading of 0.208% alcohol concentration. However, the trial court sustained an objection by Stuart's attorney to the machine's printout containing the alcohol concentration reading. The basis of the objection was that the machine was not properly functioning at the time the test was given.

The background of Stuart's attorney's objection is found in the cross-examination of Officer Pikka. Since May of 1986, when he received his training, Pikka has held a Type II–R permit on the BAC Verifier. Part of Pikka's duties are to care for and maintain the machine in question.

In the course of his duties, Pikka performed a maintenance check in January of 1987 which included a diagnostic check showing that the "sample chamber" of the machine had a set temperature of 50° C

and an actual temperature of 53° C. A similar diagnostic check performed on February 25, 1987, disclosed that the sample chamber was set at 50° C and that the actual temperature was 53° C. In performing both checks, Pikka found each operation of the machine to be "satisfactory [and] ... within established limits."

During Pikka's cross-examination he was asked if he used a manual titled, "The BAC Verifier." He stated that he used the manual in performing his duties. Pikka also testified that he was given the manual by the Missouri State Highway Patrol at the time he obtained his training on the machine in 1986, with the exception of a supplemental page discussed *infra*. Without further foundation than that already mentioned, Stuart's attorney offered the entire manual, except the supplemental page, into evidence.

The manual consists of several tabbed sections. The first section of the manual is for use by operators. Other tabbed sections of the manual are apparently intended for use by supervisory and maintenance personnel who are presumably Type II permittees such as Pikka.

Although the Director objected, the trial court was apparently persuaded that the manual was admissible in evidence. The court admitted the manual except for the supplemental page following page 14 under the tab designated, "Operator Manual." Page 14 of the "Operator Manual," in pertinent portion, states as follows:

BAC VERIFIER

INTERNAL DIAGNOSTIC TEST

The internal diagnostic test provides the ability for the BAC VERIFIER to generate a self-report on its complete operating status. The following conditions are reported:

. . . .

The temperature of the heated collection cylinder and the sample chamber is checked and compared to a preset level, normally 50° C, it should not vary more than ± 1° C.

An "X" appears across the last quoted paragraph with a notation "See Supplement." The supplemental page, in pertinent part, reads as follows:

CORRECTION

PAGE 14

INCORRECT STATEMENT: "... temperature of the sample chamber and collection cylinder should not vary more than ±1° C from the set point."

CORRECTED STATEMENT: "... temperature of the sample chamber is checked every .25 seconds. A temperature error will occur if the temperature deviates by greater than ±5° C from the set point."

EFFECTIVE DATE: July, 1984

Because the supplement had only been added a few days before the trial and was not in the book on the date the breath analysis was conducted on Stuart, the trial court refused to admit the supplemental page when offered by the Director.

From reading the entire manual, it appears that page 14 of the "Operator Manual" is not used by a Type II permittee in performing maintenance checks or making repairs on the machine. The information on that page is simply general information provided to an operator of the machine. A Type III permittee is authorized to operate the machine but does not actually perform the internal diagnostic test.

A separate tabbed section in the same manual, titled "Service Diagnostics," specifically describes the procedures involved in the internal diagnostic test mentioned on page 14 in the "Operator Manual." In the "Service Diagnostics" section, the reader is told that when the internal "diagnostic check" is run on the machine; any one of eight malfunctions is detected. Each such malfunction is reported on a printout produced by the machine. One such malfunction is printed as "Temp Hi" or "Error 3." The manual states, "[i]f actual temperature for the sample chamber or collection cylinder rises 7° C above set temperature, Error 3 will occur, TEMP HI." The manual then gives technical instructions on how to correct this error or malfunction. This section of the manual was not mentioned by

Stuart's attorney or referred to by the court. The diagnostic check run both before and after Stuart's breath test did not print either "TEMP HI" or "Error 3," thus indicating proper functioning of the sample chamber heater of the machine.

The Director, in response to the admission of the manual without the supplement, offered to prove that when Pikka had received his training, he received information that the machine would operate properly within tolerances of $\pm 3°$ C. The trial court refused the offer. The court also refused the Director's offer of proof that Pikka would testify "that the reason for maintaining the machine at 50 degrees plus or minus a variance is that, at 40 degrees condensation occurs in the machine; and at 60 degrees, the machine is more expensive to operate.... And, further, that within the 40- to 60-degree tolerance range, that there is no effect on the results of the machine."

The trial court, after finding that the Director had failed to prove by a preponderance of the evidence that Stuart drove with thirteen-hundredths of one percent or greater blood alcohol content, entered judgment against the Director and ordered Stuart's driver's license reinstated. From the judgment, the Director appeals.

■ If a breathalyzer test is administered by a certified operator in accordance with the operating procedures promulgated by the Missouri Division of Health, a prima facie case for the admission of the test results is made. *Collins v. Director of Revenue*, 691 S.W.2d 246, 253 (Mo. banc 1985). A contention that the breathalyzer was not operating properly can only validly be made if supported by some evidence which at least suggests that a malfunction occurred despite adherence by the testing officer to the correct test methods. *Collins v. Director of Revenue, supra*, at 253; *Bradford v. Director of Revenue, supra*, at 210.

■ If "The BAC Verifier" manual is incompetent evidence, there is no evidence to suggest that a malfunction occurred. The manual in question was not a part of 13 Mo.Admin.Code 50–140, the state regulation regarding the operational procedures required in using the BAC Verifier. The manual also did not qualify under § 490.680 as a business record of the Rolla Police Department. The manual is merely a private publication of unknown origin, but apparently authored by the manufacturers of the machine.

■ Generally, a publication by a private person or organization is not admissible for the truth of matters stated therein because such publications are hearsay evidence of matters about which living witnesses could be called to testify. *Superior Ice & Coal Co. v. Belger Cartage Service, Inc.*, 337 S.W.2d 897, 906 (Mo.1960); *Longshore v. City of St. Louis*, 699 S.W.2d 16, 18 (Mo. App.1985). That rule is subject to what is known as the trade journal exception. If there is evidence that the publication contains information of everyday professional and business need, intended to be circulated publicly and consulted by interested persons, tested by their use and found by experience to be trustworthy and actually relied upon in the work or occupation, such publications are admissible under the trade journal exception to the hearsay rule. *Longshore v. City of St. Louis, supra*, at 18–19; *Baker v. Atkins*, 258 S.W.2d 16, 20 (Mo.App.1953).

Here there was no evidence showing that any information in the manual, particularly on page 14 of the "Operator Manual," was used, trustworthy, and actually relied upon by Pikka or others. The entire manual should have been excluded from evidentiary consideration.

■ If the manual was properly admitted, which we do not assume, the trial court should not have excluded from consideration the page supplementing page 14 in the "Operator Manual" section. The trial court also apparently disregarded the "Service Diagnostics" section of the manual. Where written exhibits are introduced into evidence, the entire contents of the exhibits are in evidence and may be considered absent a proper objection. *Ellis v. Farmer*, 287 S.W.2d 840, 844 (Mo.1956);

*Skelton v. General Candy Co.,* 539 S.W.2d 605, 614 (Mo.App.1976).

■ The only rationale for admitting the manual was to prove the acceptable temperature tolerances for the operation of the machine. Whether the supplementary page was added before or after Stuart's breath test would not affect the general mechanical and scientific principles involved in defining the acceptable temperature parameters within which the components of the machine function. Stuart's attorney's objection that the supplement could not be considered because it was not part of the manual when Stuart took the breath analysis was without merit and should have been overruled.

■ In addition, the trial court should have admitted and considered Pikka's testimony regarding the permissible temperature tolerances. The reasons for rejecting his testimony are unclear, but the two ostensible reasons are that there was a lack of foundation showing Pikka to be qualified as an expert or that his testimony was hearsay.

Pikka, as a Type II–R permittee, is authorized to train individuals to qualify for all permit levels and to make field repairs and inspections on machines for which he has been granted a permit. 13 Mo.Admin. Code 50–140.040(2). A Type II–R permittee must possess all the qualifications of those persons he is authorized to train, which includes having demonstrated "complete knowledge of the mechanical and theoretical operation of each and every breath analyzer for which the applicant is seeking a permit." 13 Mo.Admin.Code 50–140.-030(2)–(5). The fact that Pikka was qualified as a Type II–R permittee was all the foundation necessary to demonstrate he was an expert on the technical matters about which he was offered as a witness.

Generally, the trial court is vested with broad discretion in determining the qualifications of an expert witness. *Falke v. Snyder,* 459 S.W.2d 281, 283–84 (Mo.1970); *Mathis v. Glover,* 714 S.W.2d 222, 229 (Mo. App.1986). That discretion is abused if the court's ruling is contrary to the logic of the circumstances or when it is arbitrary or unreasonable. *Mathews v. Chrysler Real-ty Corp.,* 627 S.W.2d 314, 318 (Mo.App. 1982). Assuming the basis of the trial court's rejection of Pikka's testimony was an insufficient foundation to demonstrate his qualifications as an expert in the mechanical and theoretical operation of the machine, the rejection defies logic, contradicts the regulatory definition of a "Type II–R" permittee, and amounts to an abuse of discretion.

■ A second reason why the trial court may have rejected Pikka's testimony regarding the temperature tolerances was that the trial court considered such information to be hearsay. Pikka admitted that the information he had concerning temperature tolerances was told to him by instructors as part of his education and study of the machine. In testifying as to the proper functioning of a BAC Verifier, Pikka, as an expert on the mechanical and theoretical operation of the machine, may take into consideration the products of his education. 32 C.J.S. *Evidence* § 546(63) (1964). There are innumerable areas of expertise in which professionals are permitted to rely on generally accepted information within their profession relating to norms and tolerances of heat, cold and stress. That data is usually acquired during the educational process and is rarely acquired as a result of personal observation or experiment. Physicians, engineers, veterinarians, architects, and others regularly rely on such information in forming expert opinions.

A Type II–R permittee is entitled to render an opinion as to whether an alcohol breath analysis machine which he routinely inspects, repairs, and maintains, and for which he holds a permit, is functioning properly. The maintenance reports admitted in evidence and done both before and after Stuart's breath test show each part of the machine checked, including the temperature of the sample chamber, "to be satisfactory or operating within established limits." As an incident to that evidence, Pikka should have been permitted to testify as to the basis of his opinion, including the effect of the temperature being too low or too high and the acceptable temperature tolerances. In so testifying, there is no violation of the hearsay rule.

The trial court erred in admitting and considering the manual. The trial court compounded that error by failing to admit the supplement to the manual and failing to consider the subsequent portions of the manual relating to service diagnostics. Finally, the court should have considered Pikka's testimony regarding the temperature tolerances of the machine. Disregarding incompetent evidence and treating as admissible evidence improperly rejected by the trial court, any evidentiary suggestion of machine malfunction evaporates. As a result, the breath analysis of Stuart, having been performed according to the regulations of the Division of Health, should have been admitted in evidence and considered by the court.

The only competent evidence before the court clearly demonstrates that Stuart was driving a motor vehicle on February 8, 1987, and that at the time the arresting officer had probable cause to believe Stuart had committed an alcohol-related traffic violation, and that Stuart had a blood alcohol level of equal to or greater than thirteen-hundredths of one percent by weight. Accordingly, the judgment is reversed and the cause remanded to the trial court for entry of a judgment consistent with those findings.

CROW, P.J., and GREENE, J., concur.